614 So.2d 942 (1992)
T.K. STANLEY, INC.
v.
Sammie CASON and Alton Cason.
No. 90-CA-0393.
Supreme Court of Mississippi.
December 31, 1992.
Rehearing Dismissed April 8, 1993.
*944 Glenn Gates Taylor, Copeland Cook Taylor & Bush, Jackson, John R. Gunn, Waynesboro, for appellant.
Stanford Young, Waynesboro, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and BANKS, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Sammie and Alton Cason filed a complaint to begin this suit on June 9, 1986. Their complaint alleged that T.K. Stanley, Inc.'s operation of a salt water disposal well near their home constituted a nuisance by polluting the air and water. The complaint further alleged that as a result of the pollution, Sammie Cason had suffered damages to her voice and breathing ability, incurred medical expenses and suffered permanent damage to her health. The Casons alleged that they had been forced to move from their home and further that the actions of T.K. Stanley had been willful and wanton, justifying an award of punitive damages. The case finally went to trial beginning January 8, 1990, and lasting through January 16, 1990. The jury awarded them $150,000. The trial court refused to grant T.K. Stanley, Inc.'s motion for a new trial or J.N.O.V., whereupon it perfected this appeal presenting the following issues for discussion by this Court:
I. ALL OF THE JURORS WERE NOT COMPETENT, FAIR AND IMPARTIAL.
II. THE TRIAL COURT ERRED IN ALLOWING PLAINTIFFS' TOXICOLOGIST TO GIVE AN OPINION NOT DISCLOSED IN DISCOVERY.
III. PLAINTIFFS' TOXICOLOGIST WAS NOT QUALIFIED TO GIVE AN OPINION OF PERMANENT DISABILITY.
IV. PREJUDICIAL STATEMENTS BY PLAINTIFFS' COUNSEL PREVENTED STANLEY FROM RECEIVING A FAIR TRIAL OR A VERDICT BASED ON THE EVIDENCE.
V. THE TRIAL COURT ERRED IN GIVING AN INSTRUCTION WHICH QUESTIONED THE LAWFULNESS OF STANLEY'S OPERATIONS.
VI. THE EVIDENCE WAS NOT SUFFICIENT TO MAKE OUT A CASE OF LIABILITY FOR NUISANCE.
VII. THE VERDICT OF THE JURY, BEING INFLUENCED BY A PREJUDICED JUROR, IMPROPER TESTIMONY AND INSTRUCTIONS, AND PREJUDICIAL REMARKS OF COUNSEL, WAS GROSSLY EXCESSIVE, EVIDENCING BIAS AND PASSION ON THE PART OF THE JURY.

FACTS
In the spring of 1984, T.K. Stanley, Inc. (Stanley) established a salt-water injection well using a dry hole previously drilled by another oil company. The well was just to the east of Highway 84 about five (5) miles north of Waynesboro in the Boice community. Alton and Sammie Cason owned an acre of land just across Highway 84 and downhill from the well, which they had purchased in 1975 and onto which they had moved their mobile home in 1976.
Stanley used the well to dispose of salt water, a by-product of oil and gas production, for a fee. Many of the wells from which water was injected into the Stanley well contained hydrogen sulfide gas (H2S) along with the natural gas. Hydrogen sulfide gas, unlike natural gas, is not a useful gas and in fact is extremely dangerous when concentrated at high levels. The gas *945 is soluble in water and water taken from a well which produced H2S could be expected to have some H2S dissolved in it. When the water is moved or when the temperature of it changes, the gas expands and separates from the water.
Jack Barnridge, an oil field safety expert who testified for the Casons, stated that a concentration H2S of from 100 to 200 parts per million (ppm) could kill a person immediately if breathed into the lungs. For repeated exposure, Barnridge testified that the Industrial Hygiene Association recommended that a person working around H2S for eight hours should not be exposed to over 10 ppm. Barnridge also testified that the rotten-egg odor of H2S may be detected by humans when present in very faint traces, as low as .03 ppm, well below the levels generally accepted as harmful. Margaret Sartar and Richard Ball of the Mississippi Bureau of Pollution Control confirmed that testimony.
Mrs. Cason testified that soon after Stanley began operating the well in 1984 she began experiencing difficulty breathing and had laryngitis almost constantly. As a housewife, Mrs. Cason stayed at their home most of the time. She stated that when Stanley dumped the salt water, the area around their mobile home smelled of rotten eggs and the air would burn her nose, throat and air passage. She testified that once, when Stanley was dumping a load of water, her husband Alton began to smother and had to run inside the mobile home. She testified that the smell was almost constant at their home from the time that Stanley began dumping in 1984 until the well was shut down in 1989, sometimes being so bad that it awakened her at night.
Margaret Sartar of the Mississippi Bureau of Pollution Control testified that the Bureau sent her to the Cason's house to investigate a complaint concerning odor from the well. On March 3, 1986, she went to the Cason's house and to the well. She testified that she found the Cason's house was across the highway and downhill from the disposal well. She noticed the smell of H2S at the Cason's house. Sarter then went across to the well where a driver had just unloaded. Again she noticed the smell of H2S, which was strong enough to burn her eyes and nose under the vent for one of the tanks. However, no scientific measurements of the H2S were made at either location.
As a result of Sartar's investigation, Bobby Whitaker of the Bureau of Pollution Control wrote Woody Farrar, Vice-President of Stanley. In his letter of March 12, 1985, Whitaker told Farrar that "[s]ince H2S is present in the gases released from the salt water tanks, control of these emissions is necessary. A continuously lit flare, or some type of vent scrubber will probably be required to insure that the H2S emissions are reduced to an acceptable level." The letter requested Stanley to return an application for a permit to operate a facility emitting gaseous material, which would have required Stanley to detail the amount of H2S present in the materials being handled.
Whitaker and Farrar subsequently spoke several times about the problem, which Whitaker testified was finally solved when Farrar told him that they would no longer haul from sour gas wells (those producing H2S). Farrar wrote Whitaker a letter dated April 8, 1986, which stated that, "[t]his letter is to notify you that we will no longer haul from the Alabama well that has the problem of H2S odor that we have previously discussed." However, Farrar admitted at trial that they had hauled salt water from many wells that produced H2S. He later explained the discussions with Whitaker concerning only the Alabama well by stating that the odor from that well was stronger than from the others.
After he received the first letter from Whitaker, Farrar hired Southern Testing Company to test around the well for H2S. Glenn Sanderson, an employee of Southern Testing, performed the testing on March 24, 1986. He tested the air inside and outside the tanks. Although he found very high levels of H2S inside the tanks, his instruments, which could detect as little as 5 ppm, did not measure any quantity of the *946 gas outside of the tanks. He did not test around the Cason's home.
After Sanderson's test, Farrar asked him what they could do to lessen the smell. Sanderson and a crew attempted to set up a flare to burn the gas. Sanderson stated that they tried for half a day to get the flare working but that it would not burn. He did not know how full the tanks were on the day they tried to set up the flare. Sanderson testified that on a hot day any gas inside the tanks would expand and get out of the tanks, probably through the vent lines.
Several witnesses, including Woody Farrar, testified that, since H2S is heavier than air, any gas that did escape from the tanks would seek the lowest point, running along the ground somewhat like water. Further, the witnesses generally agreed that, if there were no wind to disperse the gas, it would accumulate in the lowest area around the well.
The Casons called ten other witnesses, including a minister, to testify that they had smelled the odor on or near the Casons' property throughout the period when the well was operated. Even Woody Farrar admitted that the well had at times emitted an odor. However, Farrar steadfastly held to the claim that the amount of gas emitted from the facility was not harmful, although he admitted that neither he nor any of his employees ever tested for the presence of H2S on the Cason's property. When asked whether he thought he had the right to continue to operate the well regardless of the effect on the Casons, Farrar responded, "I guess so; yes, sir."
Because of the effects of the dumping on her health, Mrs. Cason testified, she and her family moved from their home twice. The first time they moved was in June of 1986, but they were only able to afford a rental house for one month and then returned to the mobile home. However, they paid their last note on the mobile home in September and were then able to afford to pay rent, so they once again moved away and remained away until September of 1989, eight months after Stanley stopped using the well.
Mrs. Cason admitted that she had experienced health difficulties similar to those she attributed to H2S exposure as early as 1981. At that time, she had a cold that developed into bronchitis, which took her about two weeks to get over. She had also experienced two bouts with laryngitis which did not last long and cleared up with no lingering effects.
Dr. William Ross, Mrs. Cason's doctor in Waynesboro, testified that he or his partner had been treating Mrs. Cason for episodes of laryngitis and bronchitis since 1981. However, Dr. Ross testified that the frequency of her problems seemed to increase dramatically after she began relating to him her problems with exposure to the gas around her home, and he felt that exposure to H2S could have been the cause for her worsening condition. However, he stated that he would have to defer to Dr. Holmes, a pulmonary specialist to whom he had referred Mrs. Cason, to confirm whether or not the H2S exposure made her condition more severe. Dr. Ross referred Mrs. Cason to several specialists in attempts to give her some relief, but only Dr. Edward Holmes, a board-certified practitioner in internal and pulmonary medicine, was used as a witness at trial (by deposition).
Dr. Holmes first saw Mrs. Cason on July 23, 1986. He diagnosed her as having both asthma and bronchitis, which he stated frequently go together. He testified that, by her history, he felt that H2S or some other noxious gas she inhaled had certainly aggravated her condition. He stated that even if she had experienced similar problems before her exposure, he thought the exposure had aggravated her condition. However, Dr. Holmes thought that her prognosis was good if she could get away from the gas. On cross-examination, he admitted that he would expect her condition to improve to what it had been prior to the exposure to the H2S, if that indeed had been the cause of her problems. Dr. Holmes felt that while her condition slowed her down, Mrs. Cason was not "disabled."
Anthony J. Verlangieri, Ph.D., a toxicologist at the University of Mississippi Department of Pharmacology and Toxicology, *947 also testified on behalf of Mrs. Cason, over Stanley's objection. He testified that H2S was an oxidant with a voracious ability to attack and damage human tissue. According to Dr. Verlangieri, even very low levels of H2S exposure could produce adverse effects on the human respiratory tract. Chronic inhalation of H2S could, he testified, cause laryngitis, bronchitis, chemical pneumonia and asthma. His review of Mrs. Cason's medical records led him to believe that she also had emphysema, even though none of her doctors had yet diagnosed her with that condition. In Verlangieri's opinion, Mrs. Cason's condition was caused, or at least contributed to, by her exposure to H2S gas.
The Cason's counsel asked Dr. Verlangieri whether Mrs. Cason would be permanently disabled as a result of her condition, whereupon defense counsel objected on the basis that no opinion as to the extent of disability was furnished in discovery and that such an opinion was outside Dr. Verlangieri's expertise. The court overruled the objection and allowed the opinion. Dr. Verlangieri testified that he believed Mrs. Cason was 75% permanently disabled.
Paul Oliver, Ph.D., an economist at the University of Mississippi, testified to the value of the loss of services of a housewife. Based on Mrs. Cason's life expectancy of 47.2 years and assuming that her services could be replaced by someone paid minimum wage for 40 hours a week, Dr. Oliver stated that the total needed to replace Mrs. Cason would be $328,890. Discounted to present value, the total amount needed would be $174,372. If Mrs. Cason were less than totally disabled, he stated that the value of her lost services could be easily determined by multiplying his figures by the percentage of disability.
In its defense, Stanley called Hershel Allgood, who worked as the pumper for the well three and one-half years and was there almost every day. He acknowledged that he smelled an odor at the well, sometimes daily and sometimes not for a week or two. However, the smell never had an adverse effect on him or anyone else at the well. No one ever used a breathing apparatus.
Clifton Fulkerson testified that he tested the air around the well for Stanley eighteen times between August 1, 1988 and October 3, 1988. Using an instrument which could detect H2S concentrations as low as 2 ppm, he never found any H2S present in the air surrounding the facility and did not even smell any.
Tradis West, a field inspector for the Mississippi Oil and Gas Board, testified that he tested the air around the facility twice at the request of Alton Cason and Sonny Rainwater, another resident of the area. Although he testified that the odor of H2S was present at the facility, he did not pick up a detectable concentration on either unannounced visit. On cross-examination, West stated that the well had been shut down by the Environmental Protection Agency.
Ricky Webb, an oil well pumper and Alton Cason's nephew, testified that he passed the well every day. He only smelled H2S on an erratic basis, once every month to six months, sometimes for two days in a row. However, he admitted on cross-examination that the smell could be sporadically detected from the time the well was established until it was abandoned. He also testified that the last time he spoke with Sammie Cason, in 1980, she had a very weak voice.
Woody Farrar testified that before Stanley hired Hershel Allgood, he had been at the well practically every day it operated in 1984 and 1985. He never had burning eyes or a runny nose. According to him, 75% of the water they pumped into the well came from non-H2S wells. When they resumed pumping from the Alabama well, which they had told Whitaker they would no longer pump from, they did so under a "closed system" under which the water moved directly from the tanker truck into the well bore, thereby eliminating any odor problem from passing the water through the four tanks. No one ever asked the company to test the air on the Cason's property.

*948 DISCUSSION

I.

ALL OF THE JURORS WERE NOT COMPETENT, FAIR AND IMPARTIAL.
On March 7, 1990, the lower court held a hearing on Stanley's motion for J.N.O.V. or new trial, alternatively, for remittitur. Prior to that date, Stanley filed several affidavits challenging the composition of the jury and certain information allegedly injected improperly during the jury's deliberations. The Casons also had a motion to strike those affidavits before the court for hearing on that date. At the hearing, the Cason's objected to the court considering any affidavits or hearing any testimony to impeach the verdict. The court decided to allow live testimony.
Stanley's objections to the impaneling and deliberations of the jury all centered around a single juror, Shirley Singleton. First, Stanley claimed that she did not respond to questioning during voir dire which was intended to reveal possible prejudice against Stanley. Questions were asked concerning whether the jurors had any connections with Stanley, which would keep them from being impartial; whether anyone knew anything about the facts of the case; whether anyone had ever heard talk about the case; whether anyone knew any of the witnesses; whether anyone or their family members had ever been involved in a lawsuit; and, whether anyone knew the Casons. Stanley's motion contended that juror Singleton should have responded in the affirmative to each of these questions.
Stanley introduced records of the Worker's Compensation Commission showing that Singleton's brother was killed in an accident on July 23, 1983, while driving a truck for Stanley. Singleton testified at the hearing that she did not think of her brother's death when the questions were asked on voir dire. The records from the Worker's Compensation Commission show that she was not a party to the case. However, Joanne Henderson, Singleton's former employer, testified that Singleton had told her before about her brother's death, while working for Stanley and that, as far as Singleton knew, her family had never received any settlement from Stanley. Henderson also stated that Mrs. Cason had been in her store and that Singleton had waited on her. She overheard Mrs. Cason telling Singleton about her voice problem and that something in the air had caused it. Mrs. Henderson admitted that she was a friend of Linda Farrar, wife of Steve Farrar, the other Vice-President of Stanley. She contacted Linda Farrar after she found out about the verdict and the fact that Singleton was on the jury.
Janie Brown also served on the jury and was called as a witness at the hearing. She testified that, during a recess, Mrs. Singleton told the other jurors that she had read in the local newspaper that the Cason's were asking for $1.5 million in damages and that she thought that they should get it. Brown testified that during Tradis West's testimony and again during deliberations, Singleton told the other jurors that she knew West and that he could not be trusted. Brown testified that Singleton told the jury that she had spoken with Mrs. Cason before and that her voice really was the way it had sounded during her testimony. Finally, Brown stated that when nine of the jurors had agreed to award the Cason's $50,000 in damages, Singleton persuaded them to add $100,000 to that because the lawyer would have to be paid out of the award. Judge Roberts noted on the record that Mrs. Brown had called him the day after the verdict and that he had returned her call the following week.
Singleton testified that it just did not occur to her to mention her brother's death during voir dire. She did not remember Tradis West's name being specifically mentioned as a prospective witness during voir dire. She admitted that she knew of him before the trial, but emphatically denied ever stating anything about him to the jury. She admitted that she had spoken with Mrs. Cason before the trial and asked about her voice, but denied that Mrs. Cason had mentioned the well. She denied bringing up a newspaper article, Mrs. Cason's voice or Tradis West's credibility in the *949 jury room. Finally, she denied that she had argued for adding $100,000 to the verdict.
The court also heard testimony from Woody Farrar and two of the defendant's attorneys to the effect that if they had known all of the information allegedly withheld by Singleton during voir dire, they would have challenged her as a juror, either peremptorily or for cause.
The court ruled that the questions to the jury panel were not direct enough to require a response from juror Singleton, and even if they had been, no prejudice resulted to the defendant. The court expressed concern over the violations of the jury's deliberations and seemed to refuse to consider the allegations of Singleton's misconduct during deliberations.

A.
We will discuss an alleged deception by Mrs. Singleton during voir dire. This Court has previously stated that:
Following a jury's verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and, failing that, we must reverse on appeal. We presume prejudice. Where, as a matter of common experience, a full and correct response would have provided the basis for a peremptory challenge, not rising to the dignity of a challenge for cause, our courts have greater discretion, although a discretion that should always be exercised against the backdrop of our duty to secure to each party trial before a fair and impartial jury.
Myers v. State, 565 So.2d 554, 558 (Miss. 1990).
Under this standard, juror Singleton's failure to respond to several of the questions raises the presumption of prejudice. The jury was asked whether anyone had spoken with them about the merits. At the post-trial hearing, Mrs. Singleton admitted that she had waited on Mrs. Cason at the shop where she worked and had discussed Mrs. Cason's voice problems. Since her health problems were one of the principal points of contention at trial, the relevance of a candid answer at voir dire is apparent.
As discussed, Singleton's brother, Lee Shoemaker, died in an accident while working for T.K. Stanley, Inc. and his heirs (which did not include Singleton) received worker's compensation benefits. The only question under the Odom test thus seems to be whether Singleton had substantial knowledge of the claim. She testified that she did not think of the claim, not that she did not know of it, and Henderson testified that she had mentioned the incident to her and that she did not believe T.K. Stanley, Inc., had made any settlement with her family.
As for Singleton's explanation that she merely "knew of" Tradis West, it is inadequate and hair-splitting. The question on voir dire should have been sufficient to elicit a response from her. This is particularly so if, as juror Brown testified at the post-trial hearing, Singleton had enough knowledge of West to entertain a low opinion of his veracity.

B.
Cason's argument that another juror's testimony should not have been heard to impeach the verdict is misplaced. It is true that, in general, jurors will not be heard to impeach their own verdict. However, M.R.E. 606(b) provides for an exception. It states:
(b) Inquiry into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside *950 influence was improperly brought to bear upon any juror. (emphasis added)
The "extraneous prejudicial information" includes information brought into the jury room by another juror, so that a juror may testify about another juror's words or actions in bringing such information before the jury. Schmiz v. Illinois Cent. Gulf R. Co., 546 So.2d 693, 697 (Miss. 1989). This is in accord with Mississippi's pre-rules practice. Bickcom v. State, 286 So.2d 823, 825 (Miss. 1973). In Schmiz, supra, at least two jurors visited the site of the railroad crossing where the accident at issue had occurred, then reported their findings to their fellow jurors. Not only did this Court find the jurors' testimony competent, under the circumstances, it also found such testimony grounds for a new trial, since "[t]here is more than a reasonable probability that the verdict of this jury was influenced by the impressions the investigating jurors gained from their visit to the scene, which were communicated to the jury" on an important issue in the case. Id. at 698. Accord, Crawley v. Illinois Central R.R. Co., 248 So.2d 774 (Miss. 1971).
Similarly, this case must be retried as a result of Singleton's misconduct. The evidence is overwhelming that she withheld material information during voir dire which would have resulted in her being challenged by Stanley, then relayed that exact disqualifying information to the other members of the jury during deliberations.

II.

THE TRIAL COURT ERRED IN ALLOWING PLAINTIFFS' TOXICOLOGIST TO GIVE AN OPINION NOT DISCLOSED IN DISCOVERY.
Stanley claims that Dr. Verlangieri's opinion as to Mrs. Cason's 75% disability, allowed by the trial court over objection, came as a total surprise and was a violation of the duty to give complete discovery. The Cason's filed a supplemental answer to Stanley's expert witness interrogatory on December 20, 1989, which purported to be "the expert opinion of Dr. Anthony J. Verlangieri, Ph.D." (Cp. 977-79). Verlangieri's opinion was stated as:
It is my opinion that chronic exposure to the hydrogen sulfide gas originating from the T.K. Stanley, Inc. waste-well caused or contributed to the pulmonary pathology of Mrs. Sammie Cason. This pathology includes chronic respiratory inflammation and infections and extrinsic asthma with a possible non-reversible COPD component.
Miss.R.Civ.P. Rule 26(b)(4)(A)(i) requires that, upon request from the opposing party, a party must disclose not only the name of his expert witnesses, but he also must "state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." The purpose of this, and other Rules of Civil Procedure was stated in Harris v. General Host Corp., 503 So.2d 795, 796 (Miss. 1986):
We have long been committed to the proposition that trial by ambush should be abolished, the experienced lawyer's nostalgia to the contrary notwithstanding. We have sought procedural justice through a set of rules designed to assure to the maximum extent practicable that cases are decided on their merits, not the fact that one party calls a surprise witness and catches the other with his pants down.
In re Conservatorship of Stevens, 523 So.2d 319, 320-21 (Miss. 1988). Accord, Jones v. Hatchett, 504 So.2d 198, 201 (Miss. 1987).
Of course, Rule 26(f) requires a party to supplement responses as additional information or witnesses come to the party's attention.
"When a breach of the discovery rules occurs, one of the sanctions authorized under our rules is `an order ... prohibiting him [the defaulting party] from introducing designated matters in evidence.' Rule 37(b)(2)(B) and (d), Miss.R.Civ.P."
Stevens, 523 So.2d at 321. Accord, Simmons v. Bank of Mississippi, 593 So.2d 40, 43 (Miss. 1992).
The lower court found the supplemental answer to the expert interrogatory sufficient *951 to put Stanley on notice that the extent of disability might be a part of Dr. Verlangieri's testimony. This Court disagrees. The rule requires the party to state the subject matter on which the expert is expected to testify. Permanent disability is a separate subject matter from causation, especially since it is one of the principal elements of damages in this case. Cason's answer to the expert interrogatory limits the subject of Verlangieri's testimony to establishing the possible medical relationship between exposure to H2S and Mrs. Cason's illnesses.
This Court considered a similar case under the statutory discovery scheme in existence before the adoption of the Mississippi Rules of Civil Procedure. In Winston v. Cannon, 430 So.2d 413 (Miss. 1983), the Court held that an answer to an interrogatory listing a treating physician as a witness to testify as to disability, but never supplemented to state the doctor's opinion on disability, was an insufficient answer to place the opposing party on notice. The Court stated that the lower court did not err when it refused to allow the doctor's testimony on the question of disability. Id. at 415.
In the case sub judice, Dr. Verlangieri never stated that he had an opinion on disability. Just as in Winston, his opinion should have been excluded.

III.

PLAINTIFFS' TOXICOLOGIST WAS NOT QUALIFIED TO GIVE AN OPINION OF PERMANENT DISABILITY.
Stanley argues that it was not shown that Dr. Verlangieri had any "special knowledge" which would enable him to draw a valid conclusion as to whether or not Mrs. Cason suffered from any disability. The real basis for Stanley's objection seems to be that Dr. Verlangieri is not a medical doctor and has not treated patients. The decision whether an expert is qualified rests in the sound discretion of the trial court. Smith v. State, 530 So.2d 155, 162 (Miss. 1988).
Rule 702, M.R.E. states that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." More simply put, "[t]he question is whether the particular witness really is an expert in the field in which he or she is tendered." Harris v. Shields, 568 So.2d 269, 272 (Miss. 1990). The field of expertise must be one "in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion." House v. State, 445 So.2d 815, 822 (Miss. 1984).
This Court has already established that toxicology is such a field of expertise and that Dr. Verlangieri is a qualified expert in the field. Sonford Products Corp. v. Freels, 495 So.2d 468 (Miss. 1986) (overruled on other grounds by Bickham v. Department of Mental Health, 592 So.2d 96, 98 (Miss. 1992)). The Sonford Court also cited the following definition of toxicology:
"a science that deals with poisons and their effect on living organisms, with substances otherwise harmless that prove toxic under particular conditions, and with the clinical, industrial, legal or other problems involved."
Id. at 472 (quoting Websters Third New International Dictionary (1961) (emphasis added)). Permanent disability should fall within the scope of the italicized portion of that definition. By studying the medical reports made by the treating physicians and by applying his own special knowledge, Dr. Verlangieri was qualified to give his opinion, assuming it was properly furnished to Stanley during discovery. Therefore, this assignment of error is without merit.

IV.

PREJUDICIAL STATEMENTS BY PLAINTIFFS' COUNSEL PREVENTED STANLEY FROM RECEIVING A FAIR TRIAL OR A VERDICT BASED ON THE EVIDENCE.
Stanley eventually ceased operations at the well in January of 1989, at least in part as a result of an order from *952 the U.S. Environmental Protection Agency. This order, however, concerned water pollution and was totally unrelated to the H2S emissions alleged by the Casons. Stanley filed a motion in limine to foreclose any mention of the E.P.A.'s involvement in closing the well, which the court granted, ordering the Casons' counsel to make no reference to Stanley's problems with the E.P.A. However, in his closing argument, the Cason's counsel was describing what he called Stanley's "callous disregard" for the Casons, when he stated that Stanley continued to dump at the facility until, as Travis West testified, "the E.P.A. shut them down. That's their witness." Stanley's counsel objected at that point and moved that the jury be admonished to disregard the remark, but did not ask for a mistrial.
Under this assignment of error, Stanley also argues that the Casons counsel's argument appealed to class prejudice by referring to Stanley's $350 an hour counsel, who represented doctors and also improperly stated to the jury that he had gone to a lot of expense to present the case to them. No contemporaneous objection to these statements was made in the lower court.
The argument concerning the E.P.A. shutting down the well was plainly a violation of the court's in limine order. The only real question presented here is whether the violation constitutes reversible error. In our opinion, it did not.
Stanley did not ask for a mistrial, but only for an admonishment of the jury, which they received. Even in a criminal case, such an instruction is ordinarily deemed sufficient to cure any prejudice caused by the comment or improper evidence. Estes v. State, 533 So.2d 437, 439 (Miss. 1988). While this line of argument by the Cason's counsel was highly improper, it is not reversible error on the facts of this case.

V.

THE TRIAL COURT ERRED IN GIVING AN INSTRUCTION WHICH QUESTIONED THE LAWFULNESS OF STANLEY'S OPERATIONS.
Stanley repeats its objection here to Instruction P-6, which was taken from part of the Mississippi Air and Water Pollution Control Law (Miss. Code Ann. § 49-17-1 to 49-17-43 (1972)) and designates certain air pollution as "unlawful." Similar instructions were used in the case of Vicksburg Chemical Co. v. Thornell, 355 So.2d 299 (Miss. 1978) and approved by this Court. Stanley's objection to the instruction is that the instruction was abstract and in hopeless conflict with instruction D-9, which told the jury that no evidence indicated that Stanley had violated any laws, rules or regulations of the Oil and Gas Board or the Bureau of Pollution Control.
Even though similar instructions were approved in Vicksburg Chemical, supra, Stanley seems to have a valid objection to the instruction in this case. Here, other instructions adequately set out the applicable law under which the jury could find for the Casons on a nuisance theory. The instruction at issue is a repetition of the same standards in different language.
Additionally, P-6 is a good example of an abstract instruction. The instruction merely defines what air pollution is unlawful; it does not direct the jury to do anything. Instructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error. Estate of Lawler v. Weston, 451 So.2d 739, 741 (Miss. 1984) (citing Harkins v. Paschall, 348 So.2d 1019, 1023 (Miss. 1977); Freeze v. Taylor, 257 So.2d 509, 511 (Miss. 1972)). On retrial, the instruction should not be given.

VI.

THE EVIDENCE WAS NOT SUFFICIENT TO MAKE OUT A CASE OF LIABILITY FOR NUISANCE.
Stanley's argument under this assignment of error is that the law of nuisance requires a plaintiff to show that the defendant caused an interference with the plaintiff's property which would interfere with that of an ordinary, reasonable person; Mrs. Cason had a pre-existing condition *953 and, therefore, was not an ordinary, reasonable person; therefore, no prima facie case was shown for nuisance.
This Court has approved the following definition of a private nuisance:
One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
(a) intentional and unreasonable, or
(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.
Comet Delta v. Pate Stevedore Co., 521 So.2d 857, 859-60 (Miss. 1988) (quoting Restatement (Second) of Torts, § 822).
Stanley cites American Jurisprudence (Second) for the proposition that the interference must be one which affects the ordinary, reasonable person and not "the effect of the alleged nuisance on supersensitive persons, those of fastidious tastes or temperaments, those in ill health, or afflicted with disease or abnormal physical conditions." However, Stanley fails to include the entire relevant passage from Am.Jur., which continues, in part:
[O]nce facts are introduced which could establish a nuisance based on an interference with a normal, reasonable person's use and enjoyment of land, a particularly susceptible plaintiff may recover for physical discomfort from the effects of that nuisance separately and distinctly from the damage to his property.
58 Am.Jur.2d Nuisances § 98, p. 748.
This answers Stanley's argument on the point, since many of the witnesses testified that the H2S interfered with use of the property.
Stanley also argues that the proof must show that they unreasonably used the well in order to make out a case for nuisance. The case cited for that proposition states, in part:
A fair test as to whether a business, lawful in itself, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business complained of in the particular locality, and under the circumstances of the case; and, where the use of the property is not unreasonable, it will not be enjoined, nor can a person complaining thereof recover damages.
Reed v. Cook Const. Co., Inc., 336 So.2d 724, 725 (Miss. 1976) (quoting Reber v. Illinois Central Railroad Co., 161 Miss. 885, 897-98, 138 So. 574, 576-74 (1932)).
However, probably the main thrust of the case was that every case must be decided on its own facts, giving due consideration to the reasonableness of the use of the defendant's property and the nature of the interference with the plaintiff's property. Essentially, the case espouses a balancing test.
Applying the foregoing law to this case, the Casons have sufficiently made out a prima facie case of nuisance. First of all, the proof showed a jury issue on whether Mrs. Cason had a pre-existing condition at all. The Cason's did establish that noxious odors were present on their property at many different times through the testimony of several witnesses. The presence of this odor is sufficient to cause an interference with the Cason's use of their property. An inference of a dangerous accumulation of the gas around the Casons' mobile home could also be drawn from the testimony on the properties of the gas. This issue has no merit.

VII.

THE VERDICT OF THE JURY, BEING INFLUENCED BY A PREJUDICED JUROR, IMPROPER TESTIMONY AND INSTRUCTIONS, AND PREJUDICIAL REMARKS OF COUNSEL, WAS GROSSLY EXCESSIVE, EVIDENCING BIAS AND PASSION ON THE PART OF THE JURY.
Under this issue, Stanley first argues that the Casons simply did not prove the amount of damages awarded by the jury. Stanley also argues that the jury instruction on damages allowed the jury to award damages for the same injuries under *954 different subparts, in effect "pyramiding" damages. Finally, Stanley argues that one element of damages the court instructed on, "interfering with Mrs. Sammie Cason's ability to enjoy life" is an improper element of damages which should properly be a part of pain and suffering, on which the jury was separately instructed.
Stanley's first argument is that the Cason's only proved, at the most, $12,903 in damages. They point out that the medical expenses proven were $7,113 and the rent expense was $5,790, $1,120 of which was incurred after they claim to have ceased operations at the injection well. They claim that without the testimony of Dr. Verlangieri, the record contains no support for an award of any disability, since Dr. Holmes testified that Mrs. Cason had none.
However, Dr. Holmes' actual testimony was that "if she were working for a living, I don't think she would qualify as being disabled. That was a quote, `disabled', whatever in the world that means. I do think it would hamper her somewhat in her day-to-day chores." (emphasis added). Clearly, Dr. Holmes' testimony, while not as strong as Dr. Verlangieri's supports a jury finding of disability.
Our reading of the damages instruction shows that each element of damages listed is indeed a separate and distinct element of damages. Thus, no "pyramiding" of damages occurred, as claimed by Stanley.
Stanley did not object to the damages instruction in the lower court on the grounds that it included damages for loss of enjoyment of life, or hedonic damages. Of course, where a party fails to make a proper, specific objection to allow the lower court to consider an issue, this Court will not normally entertain the assignment of error. Young v. Robinson, 538 So.2d 781, 783 (Miss. 1989). See, also, Jones v. Shaffer, 573 So.2d 740, 743, n. 2 (Miss. 1990). Following our usual rule, we decline to address this issue.

CONCLUSION
This case is reversed and remanded for a new trial, principally because of the problems with juror Singleton. Her lack of candor during voir dire and her actions in revealing what she already knew about the case to her fellow jurors resulted in fundamental unfairness to Stanley. Additionally, the lower court erred in allowing Dr. Verlangieri to give an opinion which was not adequately disclosed to Stanley during discovery. Finally, the lower court erred in granting an instruction which was abstract and probably resulted in confusion to the jury.
REVERSED AND REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION.
HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN, BANKS and ROBERTS, JJ., concur.
DAN M. LEE, P.J., dissents without opinion.
McRAE, J., concurs in results only.