658 So.2d 1352 (1995)
The PEOPLES BANK AND TRUST COMPANY
v.
Jerry CERMACK and Container Engineering Corporation.
No. 92-CA-00117-SCT.
Supreme Court of Mississippi.
June 1, 1995.
Rehearing Denied August 3, 1995.
*1353 W.P. Mitchell, Stephen H. Morris, Mitchell, Voge, Beasley & Corban, Tupelo, for appellant.
Grady F. Tollison, Jr., Tollison Austin & Twiford, Oxford, William F. Randle, Tupelo, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and BANKS, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This appeal arises from two separate suits filed in Lee County Circuit Court on September 15, 1989, by Jerry Cermack (hereinafter Cermack) and Container Engineering Corporation (hereinafter Container) against The Peoples Bank and Trust Company (hereinafter Peoples Bank) alleging inter alia, that: (1) Peoples Bank had breached its fiduciary duty it owed to Cermack and Container; (2) Peoples Bank had breached its contract with Cermack and Container; (3) Peoples Bank *1354 breached its obligation of good faith under the U.C.C.; (4) Peoples Bank breached the implied covenant of good faith and fair dealing; (5) duress; (6) negligence (alleged in Cermack's complaint alone); (7) intentional infliction of emotional distress (alleged in Cermack's complaint alone); and (8) interference with business (alleged in Container's complaint alone).[1] On October 11, 1991, the lower court consolidated these two complaints.
After the completion of all pre-trial and discovery matters, the consolidated case was tried on November 12-15, 1991, before a jury of twelve. After hearing all of the testimony and viewing the evidence, the jury was instructed as to the law and allowed to begin their deliberations. The jury completed its deliberations and returned a verdict for Cermack for $25,000 as actual damages against Peoples Bank. The jury also returned a verdict for Container in the amount of $300,000 as actual damages and $250,000 as punitive damages against Peoples Bank. Peoples Bank timely filed its motion for a JNOV or in the alternative a New Trial. This motion was denied and accordingly, Peoples Bank filed their notice of appeal to this Court. On appeal, Peoples Bank assigns the following as error:
1. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTION NUMBER P-14
2. THE COURT ERRED IN REFUSING TO GIVE DEFENDANT'S JURY INSTRUCTIONS NUMBERS D-2 AND D-4
3. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTIONS NUMBERS P-4 AND P-1
4. THE COURT ERRED IN GIVING PLAINTIFF' JURY INSTRUCTIONS NUMBERS P-3 AND P-1.
5. THE COURT ERRED IN GIVING COURT'S JURY INSTRUCTION NUMBER C-3 AND PLAINTIFF'S JURY INSTRUCTION NUMBER P-1
6. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTION P-5 AND P-8
7. THE COURT ERRED IN OVERRULING DEFENDANT'S OBJECTIONS TO THE TESTIMONY OF MARSHALL JENKINS CONCERNING CERTAIN DAMAGES ALLEGEDLY SUFFERED BY CONTAINER ENGINEERING
8. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTION NUMBER P-1
9. THE VERDICTS OF THE JURY WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND WERE A RESULT OF BIAS, PASSION AND PREJUDICE ON THE PART OF THE JURY
10. OTHER ERRORS
After carefully reviewing the record, we find merit in a number of Peoples Bank's assignments of error. For the sake of this opinion, the assignments of error will be discussed in the order in which they appear in Peoples Bank's brief.

I.

FACTS
Container first became a customer of Peoples Bank in 1973 and during the next fifteen years, Peoples Bank loaned money to Container and Cermack. Most prominent among the loans to Container was Peoples Bank's loan made under a state-sponsored Industrial Revenue Note Program that enabled Container to finance the construction of its current facility.
In 1985, Container received an inquiry from Gilson Brothers Company, Inc., as to whether Container could manufacture shipping crates for Gilson. Cermack, short of the necessary operating capital needed to take on this new account, contacted Peoples Bank about getting a loan so that Container *1355 could take on the account. After discussing the Gilson account and the capital that would be required by Container to undertake it, Peoples Bank declined to give Container a capital loan. However, Peoples Bank extended a $140,000 line of credit on Container's accounts receivable.
In 1987, Container sought additional operating capital from Peoples Bank to help it land a new account. Container was faced with cash flow problems and needed additional capital to take on the new account. Jerry Cermack, Container's president, met with three of the officers from Peoples Bank at his plant and discussed with them his need for additional capital and a restructuring of his existing debt with Peoples Bank.
Peoples Bank agreed to restructure Container's existing debt and loan Container an additional $25,000 to fund its acquisition of the new account if Container agreed to reduce its operating expenses by $35,000 per year.[2] On March 19, 1987, Peoples Bank sent Cermack a letter setting forth the terms of the proposed loan agreement. In turn, Cermack sent Peoples Bank a letter on March 20, 1987, proposing how Container would comply with the Bank's condition precedent found in paragraph "A" of the March 19, 1987, loan agreement. Peoples Bank refused to accept Cermack's March 20, 1987, proposal for reducing Container's operating expense, and on March 23, 1987, Cermack submitted a proposal for cutting operating costs that was acceptable to Peoples Bank. On May 4, 1987, after both sides agreed to the conditions set forth in the loan agreement, Cermack signed the agreement.
In addition to the requirement in the loan agreement that Container cut its operating costs by $35,000 per year (II.A.), the loan agreement also provided that:
D. Container Engineering, Inc. will not incur additional indebtness [sic] without the prior consent of The Peoples Bank & Trust Company.
The two promissory notes signed in conjunction with the loan agreement provided:
DEFAULT AND ACCELERATION: The Borrower shall be in Default upon the occurrence of any one or more of any of the following events: ... (5) Borrower fails to keep any promise under any agreements intended to secure the repayment of this Promissory Note; (emphasis added).
On March 31, 1988, Container purchased two new Navistar International trucks at an approximate cost of $165,000 without seeking approval from Peoples Bank. Cermack first gave Peoples Bank notice of its purchase of the two trucks when it submitted its quarterly financial statement to Peoples Bank on or about April 26, 1988. Peoples Bank received the quarterly statement but did not notice the journal entry that indicated that Cermack had incurred new debt and purchased the new trucks. Peoples Bank learned that Cermack had bought the trucks during July of 1988. At this point, Peoples Bank decided to wait and see what effect the purchase of the new trucks would have on Cermack's cash flow situation during the second quarter. Upon receiving and reviewing the second quarter report, Peoples Bank determined that the truck purchases worsened Cermack's cash flow problems. In August of 1988, armed with the fact that Cermack had breached his loan agreement with Peoples Bank, and that this breach had worsened Container's precarious cash flow situation, Peoples Bank decided to accelerate Cermack's outstanding debts.
On September 7, 1988, Peoples Bank gave notice to Cermack that he had violated Section II, Paragraph D of the March 19, 1987, loan agreement (Cermack incurred new indebtedness without first gaining Peoples Banks approval) and that Peoples Bank intended to accelerate the two loans evidenced by the promissory notes dated April 28, 1987. Therefore, Cermack would have to satisfy its *1356 $176,543.54 indebtedness to Peoples Bank. Peoples Bank also cancelled Cermack's revolving line of credit. The revolving loan on the accounts receivables was self-liquidating and would not require that Container acquire additional financing to satisfy this debt.[3]
Initially the September 7, 1988, letter required that Cermack satisfy his existing debt by October 8, 1988. However, after a September 15, 1988, meeting between Cermack and Peoples Bank, the bank agreed to extend the call of the loans for an additional thirty days. In a subsequent letter dated November 2, 1988, Peoples Bank granted Cermack a ninety-day extension to find new financing. Peoples Bank never took any affirmative steps to foreclose against Cermack. In fact, at the time Cermack "sold" his property, he was still operating under an extension of time that Peoples Bank had granted him to find new financing.
Cermack and his accountant attempted to obtain financing for his debts from the Small Business Administration and other banks. However, neither the Small Business Administration nor any of the banks Cermack approached would lend Cermack the needed money. In April of 1989, Cermack "sold" his building and land to David Megginson and Gayle Kinsey under a lease/buyback deal for approximately $300,000.00. Cermack paid off the $176,543.54 debt to Peoples Bank and used the remaining funds to finance the operation of his business.

II.

STANDARD OF REVIEW
On appeal, this Court does not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed. Burton By Bradford v. Barnett, 615 So.2d 580, 583 (Miss. 1993); Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35, 40 (Miss. 1989); Byrd v. F-S Prestress, Inc., 464 So.2d 63, 66 (Miss. 1985). Accordingly, defects in specific instructions do not require reversal "where all instructions taken as a whole fairly  although not perfectly  announce the applicable primary rules of law." Burton, 615 So.2d at 583. However, if those instructions do not fairly or adequately instruct the jury, this Court can and will reverse. Id.

III.

DISCUSSION

THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTION NUMBER P-14
Peoples Bank first argues that the trial judge committed reversible error when he gave Instruction P-14. Jury Instruction P-14 reads as follows:
The Mississippi statute of Miss. Code Ann. Section 75-1-208 (1972) provides in pertinent part as follows:
A term providing that one party or a successor in interest may accelerate payment or performance or require collateral or additional collateral `at will' or `when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercise. [sic]
If you find by a preponderance of the evidence in this case that Container Engineering has established that the officers or personnel of Peoples Bank and Trust Company did not believe the prospect of payment or performance was *1357 impaired in good faith then your verdict should be for Container Engineering Corporation in such an amount as in accordance with the other instructions of this Court.
In Black v. The Peoples Bank and Trust Company, 437 So.2d 26 (Miss. 1983), this Court discussed Section 75-1-208 (1972), and held that where the creditor accelerated the debtor's obligations because it felt "insecure," it was for the jury to decide whether the creditor's decision to accelerate the debtor's debt was made in good faith. In Black, we quoted Commercial Credit Co. v. Cain, 190 Miss. 866, 1 So.2d 776 (1941), and stated: "Cain was the first case to adopt this standard by holding that a creditor `may proceed upon such circumstances of presently apparent danger as would furnish probable cause for the belief that the security is unsafe when viewed in good faith by a man of reasonable prudence.'" Black, 437 So.2d at 29, quoting Cain, 190 Miss. at 871, 1 So.2d at 777.
However, Peoples Bank argues that Miss. Code Ann. § 75-1-208 (Section 1-208 of the Uniform Commercial Code) does not apply to actions under a "default-type" acceleration clause. We agree. A "default-type" acceleration is one that is conditioned upon the occurrence of an event which is within the control of the debtor. Matter of Sutton Investments, Inc., 46 N.C. App. 654, 266 S.E.2d 686, 690 (1980).
In Bowen v. Danna, 276 Ark. 528, 637 S.W.2d 560 (1982), the Arkansas Supreme Court held that Ark.Stat.Ann. § 85-1-208 (the equivalent to our Miss. Code Ann. § 75-1-208 (1972)) is inapplicable where the right to accelerate is conditioned upon the occurrence of an event, such as the lapse of required insurance coverage, which is in the complete control of the debtor. Bowen, 637 S.W.2d at 564. See also Hickmon v. Beene, 6 Ark. App. 272, 640 S.W.2d 812, 813 (1982).
Likewise, the North Carolina Court of Appeals has also addressed the issue of whether Uniform Commercial Code Section 1-208 is applicable when a note and or deed of trust contains a default-type acceleration clause. Matter of Sutton Investments, Inc., 46 N.C. App. 654, 266 S.E.2d 686 (1980). In Sutton, the debtor breached an express agreement found in his deed of trust. Accordingly, the creditor declared the entire amount of the indebtedness due under authority in the deed of trust that permitted acceleration for any breach of the agreements contained therein.
On appeal the debtor argued that the creditor's lack of good faith precluded him under G.S. 25-1-208 from further action. The Sutton court held:
This contention is without merit. The statute relied upon is that portion of the Uniform Commercial Code which imposes a good faith requirement upon the exercise of a secured creditor's option to accelerate "at will" or "when he deems himself insecure." "These clauses are clearly distinguished from the default-type clauses ... where the right to accelerate is conditioned upon the occurrence of a condition which is within the control of the debtor"... the right of acceleration upon which Richardson's rights depend in the present case is conditioned upon the occurrence of an event within the complete control of the debtor, i.e., compliance with the terms and conditions contained in the Note and the Deed of Trust. (emphasis added).
Id., 266 S.E.2d at 690. See also Mechanics Sav. Bank v. Tucker, 178 Conn. 640, 425 A.2d 124, 127 (1979); Don Anderson Enterprises, Inc. v. Entertainment Enterprises, Inc., 589 S.W.2d 70 (Mo. App. 1979).
After a lengthy review of how various jurisdictions, both state and federal, have interpreted their equivalent to our Miss. Code Ann. § 75-1-208 (1972), we find that the interpretation of Uniform Commercial Code Section 1-208 (the model for our Miss. Code Ann. § 75-1-208 (1972)) found in Bowen v. Danna, 276 Ark. 528, 637 S.W.2d 560 (1982), and Matter of Sutton Investments, Inc., 46 N.C. App. 654, 266 S.E.2d 686 (1980), is the most logical and workable. Accordingly we hold that Miss. Code Ann. § 75-1-208 (1972) *1358 is inapplicable to situations where a creditor, under the terms of its contract with the debtor, has accelerated its debtor's outstanding obligations after the occurrence of an event that was in the complete control of the debtor, i.e., where the creditor accelerates indebtedness because the debtor fails to comply with the terms and conditions contained in the promissory note, deed of trust or loan agreement. Bowen, 637 S.W.2d at 564; Sutton Investments, Inc., 266 S.E.2d at 690.
In the case sub judice, we note that Cermack did not comply with the terms and conditions contained in the loan agreement and promissory notes. Nonetheless, we also note that Peoples Bank did not immediately accelerate Cermack's indebtedness upon learning of Cermack's breach of the loan agreement. Instead, Peoples Bank waited approximately two months after learning of Cermack's breach before accelerating Cermack's outstanding indebtedness. Therefore, it could be argued that this delay in accelerating Cermack's indebtedness indicated that Peoples Bank accelerated the outstanding debt not because of the breach, but because Peoples Bank deemed itself "insecure."
If Peoples Bank accelerated Cermack's indebtedness because they felt insecure and not because of Cermack's breach of contract, then Miss. Code Ann. § 75-1-208 (1972) would apply. If, however, Peoples Bank accelerated Cermack's debt solely because of Cermack's breach of the contract, then the terms contained within the four corners of the loan agreement and promissory note would control. Because of other flaws in the jury instructions, it is not necessary for us to decide whether the bank's acceleration was due to Cermack's breach of the loan agreement and promissory notes or because Peoples Bank deemed itself insecure.

IV. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTIONS NUMBERS P-3 AND P-1.
Peoples Bank argues that the trial judge erred in submitting Jury Instructions P-3 and P-1 to the jury because P-3 misstates the law. Peoples Bank also argues that evidence adduced at trial does not support a finding of a fiduciary relationship between Peoples Bank and Container. We agree.
"While one normally does not enter into a contract with another unless he trusts and has confidence in him, contract and debt amount to a business and not to a fiduciary relationship." Bogert, The Law of Trusts And Trustees § 17, at 219-220 (2ed 1984). Similarly, "there is not a fiduciary relation between debtor and creditor as such." Restatement (Second) of Trusts § 12 comment (1957). Ordinarily, a bank does not owe a fiduciary duty to its debtors and obligors under the UCC. West Point Corp. v. New North Miss.Fed.Sav., 506 So.2d 241, 244 (Miss. 1986), citing American Bank of Commerce v. Covolo, 88 N.M. 405, 540 P.2d 1294 (1975). Even though the general rule is that there is no presumption of a fiduciary relationship between a debtor and creditor, it is possible for a debtor to prove the existence of a fiduciary relationship with its creditor. Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79 (Miss. 1991).
The existence vel non of a fiduciary relationship is a question of fact. Lowery, 592 So.2d at 85; Carter Equipment v. John Deere Indus. Equipment, 681 F.2d 386 (5th Cir.1982); Southern Mortgage Company v. O'Dom, 699 F. Supp. 1227, 1231 (S.D.Miss. 1988). "The burden of establishing the existence of a fiduciary relationship is upon the party asserting it." Mullins v. Ratcliff, 515 So.2d 1183, 1192 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 813 (Miss. 1986). Because of the severity of the burdens and penalties that are integral to a fiduciary relationship, the party seeking to prove the existence of the relationship must do so by clear and convincing evidence. Mullins, 515 So.2d at 1192, citing Norris, 498 So.2d at 814.
In Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79 (Miss. 1991), this Court, when discussing whether a fiduciary relationship exists between parties, stated:

*1359 A fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears "on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." Additionally, a confidential relationship, which imposes a duty similar to a fiduciary relationship, may arise when one party justifiably imposes a special trust and confidence in another, so that the first party relaxes the care and vigilance that he would normally exercise in entering into a transaction with a stranger.
Lowery, 592 So.2d at 83. (citations omitted).
We agree with Peoples Bank that the evidence adduced at trial did not support a finding of a fiduciary relationship between Cermack and Peoples Bank. Cermack argues, that under Carter, supra, a fiduciary relationship may arise in a commercial transaction when the circumstances establish that (1) the parties have "shared goals" in the other's commercial activity, (2) one party justifiably places trust or confidence in the integrity and fidelity of the other, and (3) the trusted party has effective control over the other party. Carter, 681 F.2d at 391.
Assuming arguendo, that the first and second elements are met in the case sub judice, the record does not support a finding that the third element was met. Container erroneously argues that the record indicates that Peoples Bank had effective control over Container. The record simply does not support this contention.
For example, Cermack alleges that on several occasions the bank told him how to run his business. Cermack alleges that the bank had effective control over his business because the bank gave him advice on collecting accounts receivable. The record indicates that the bank suggested that Cermack add a one and one-half percent "penalty" to accounts receivable that were late in paying. Cermack promptly rejected this suggestion and stated that his business clients would not accept such billing practices. Thus, Cermack refused this advice and did not act on it.
Cermack alleges that the bank exerted control over his operation when they inquired into how he set prices on his merchandise. Cermack testified that the bank told him that he should raise the prices on his merchandise. Cermack rejected this advice outright.
Cermack contends that the bank's financing of his 1982 plant construction through the Mississippi Industrial Revenue Note Program is an example of the power Peoples Bank exerted over Cermack. Notwithstanding Cermack's allegation, there is no evidence to indicate that Peoples Bank forced Cermack to finance his buildings through this program.
Next, Cermack claims the fact that he took on the Gilson account with the bank's permission demonstrates the bank's control over his operation. Once again, the facts in the record do not support this argument. Cermack claims that he took the Gilson account in part because of "the bank's recommendation and the offer of the accounts receivable loan." However, the facts in the record contradict this claim. In fact, Cermack testified at trial that he had advanced Gilson approximately $102,380.56 in credit via accounts receivables without relying on anything that Peoples Bank told him. Thus, the record clearly indicates that Cermack took on the Gilson account without any assurances or pressure from Peoples Bank. Therefore, this transaction does not support a finding of a fiduciary relationship between Cermack and Peoples Bank.
Cermack alleges that the bank exercised control over his business in 1987 when he sought additional financing from the bank. Cermack needed to refinance his debt because his cash-flow problems made it difficult for him to service his debt and stay in business. Cermack claims that the bank forced him to lay off his plant manager before he could get the refinancing from Peoples Bank. The problem with this argument is that the record clearly indicates that it was Cermack's idea to lay off his plant manager. In fact, the bank told Cermack that they did not care how he cut his operating expenses. Cermack made two cost-cutting proposals to Peoples Bank. Cermack's first proposal was *1360 rejected because it did not, in the bank's estimation amount, to tangible cuts in Container's operating costs. The second proposal offered by Cermack, which included laying off the plant manager, was accepted.
Finally, Cermack alleges that the most damaging evidence of the bank's effective control over Container occurred in 1987 when Cermack began considering the purchase of new trucks. In 1985, while Cermack sought a capital loan from Peoples Bank, John Smith of Peoples Bank suggested that Cermack sell his trucks and have an outside trucking company ship his merchandise. Cermack testified that he looked into the possibility of allowing someone else to ship his merchandise. However, Cermack testified that no one would agree to ship his merchandise or buy his trucks and ship his merchandise for him. The record reveals that this is the only suggestion that Peoples Bank gave Cermack that he even looked into. Once again, Cermack did not accept this suggestion, nor evidently, did Cermack feel compelled to sell his trucks.
In summary, we find that the facts in the record simply do not support a finding of a fiduciary relationship between Peoples Bank and Cermack. Consequently, because the instruction was not supported by the evidence adduced at trial, it was error for the trial judge to submit an instruction on breach of fiduciary duty. Munford v. Fleming, 597 So.2d 1282, 1286 (Miss. 1992); Rester v. Lott, 566 So.2d 1266, 1269 (Miss. 1990).

V. THE COURT ERRED IN GIVING COURT'S JURY INSTRUCTION NUMBER C-3 AND PLAINTIFFS' JURY INSTRUCTION NUMBER P-1.
Peoples Bank argues that the trial judge erred when he gave Court's Instruction C-3, a negligence instruction, to the jury. Likewise, Peoples Bank argues that Cermack failed to prove the elements of negligence at trial and therefore, C-3 and P-1 should not have been given to the jury. Finally, Peoples Bank argues that C-3 was an abstract instruction and should not have been given.
There are four elements necessary to prove a claim of negligence:
(1) Peoples Bank had a duty, or obligation, recognized by law, requiring Peoples Bank to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
(2) A breach of the duty, a failure on Peoples Bank's part to conform to the standard required.
(3) A reasonably close causal connection between the conduct and the resulting injury.
(4) Actual loss or damage resulting to the interests of another.
Carpenter v. Nobile, 620 So.2d 961, 964 (Miss. 1993).
Peoples Bank points to the fact that Cermack failed at trial to put on any evidence to establish that under the facts of this case that Peoples Bank owed Cermack a duty not to accelerate the note. Likewise, Peoples Bank argues, Cermack failed to establish that Peoples Bank breached its duty to him. We agree. "Only when the first two items are shown is it possible to proceed to a consideration of proximate cause since a duty and breach of that duty are essential to a finding of negligence under the traditional and accepted formula." May v. V.F.W. Post No. 2539, 577 So.2d 372 (Miss. 1991).
In the case at bar, the facts do not support a finding of negligence. Because Cermack failed at trial to support his negligence argument with credible evidence, we hold that the trial judge erred when he gave Jury Instruction C-3. Splain v. Hines, 609 So.2d 1234, 1239 (Miss. 1992).
Peoples Bank also argues that the trial judge erred in giving C-3 because, even when read with all of the other instructions, the jury was only given an abstract definition of negligence. We agree. We have stated the following when confronted by an abstract jury instruction:
Instructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error.
*1361 T.K. Stanley, Inc. v. Cason, 614 So.2d 942, 952 (Miss. 1992).
Instruction C-3 given in this case reads as follows:
The court instructs the jury that the word "negligence" means the doing of something which a reasonably prudent person would not have done under the same or similar circumstances, or the failure to do something which a reasonably prudent person would have done under like or similar circumstances.
Likewise, Instruction P-1, also given in this case, reads in relevant part:
... .
If you find from a preponderance of the evidence in this case that Container Engineering Corporation and Jerry Cermack have sustained actual damages as a proximate result of the negligence, breach of fiduciary duty, breach of duty of good faith, or breach of contract, then the Container Engineering Corporation and Jerry Cermack are entitled to a verdict in an amount which will reasonably compensate them for their losses sustained. Such damages are called compensatory or actual damages and are awarded for the purpose of making the Plaintiffs whole again insofar as a money verdict can accomplish that purpose.
... .
The trial judge erred when he gave the preceding instructions. These instructions did not inform the jury what actions or facts would constitute negligence on the part of the appellant and allowed the jury to determine questions of law as well as questions of fact. Gore v. Patrick, 246 Miss. 715, 723, 150 So.2d 169, 171 (1963). Because the record did not support a negligence instruction and because the jury was given deficient instructions as to negligence, we find the trial judge committed reversible error when he gave Jury Instructions P-1 and C-3. Draughn v. Lewis, 248 Miss. 834, 841, 161 So.2d 626 (1964).

VI. THE COURT ERRED IN GIVING PLAINTIFFS' JURY INSTRUCTIONS NUMBERS P-5 AND P-8.
Peoples Bank assigns as error the fact that the trial judge gave Jury Instructions P-5 and P-8. Peoples Bank argues that punitive damages were not justified in the case sub judice. "As a general rule, exemplary or punitive damages are not ordinarily recoverable in actions for breach of contract." Snow Lake Shores Property Owners v. Smith, 610 So.2d 357, 362 (Miss. 1992), quoting South Central Bell v. Epps, 509 So.2d 886, 892 (Miss. 1987). Punitive damages are recoverable where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort. Blue Cross & Blue Shield of Mississippi, Inc. v. Maas, 516 So.2d 495, 496 (Miss. 1987). "The test [for punitive damages] requires [a showing] of some willful or malicious wrong" or "gross negligence or reckless disregard for the rights of others." Mutual Life Insurance Co. of N.Y. v. Estate of Wesson, 517 So.2d 521, 528 (Miss. 1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).
The award of punitive damages, along with the amount of such, are within the discretion of the trier of fact. Fought v. Morris, 543 So.2d 167, 173 (Miss. 1989). Nevertheless, the trial court, in determining if the issue should be submitted to the jury, must "decide whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross neglect or reckless disregard." Colonial Mortgage Co., Inc. v. Lee, 525 So.2d 804, 808 (Miss. 1988).
Cermack argues that the following conduct by Peoples Bank warranted punitive damages: (1) Peoples Bank sent audit letters to Container's customers without notice to Container; and (2) Peoples Bank's acceleration and termination of Container's loan were intentional acts in reckless disregard of the consequences to Container.
Cermack first argues that Peoples Bank acted with reckless disregard when it sent verification letters to Cermack's account receivables customers. To understand why *1362 the bank sent verification letters to Cermack's customers, we must look to how Cermack obtained the necessary capital to fund its daily operations.
Peoples Bank financed Cermack's accounts receivable in the following manner. Cermack would get an order for shipping containers from a client. Cermack would build the shipping containers and deliver them to the client. The client would sign a billing invoice payable in a certain number of days. Cermack would then present the shipping invoice signed by the customer to Peoples Bank and the bank would advance Cermack 70% of the funds due Container on the invoice. When the customer paid the invoice, Cermack would tender the check to Peoples Bank. Peoples Bank would apply 70% of the tendered check to cover the amount it had advanced Cermack and would apply the remaining 30% to the remaining indebtedness Container had with Peoples Bank.
In the case sub judice, Peoples Bank sent verification letters to Cermack's clients prior to accelerating Cermack's debt. Peoples Bank's officer testified that he sent the verification letters to Cermack's customers to determine if the amounts reflected on the shipping invoices presented by Cermack to Peoples Bank coincided with the amounts owed to Cermack by the various customers. These verification letters were sent to Cermack's clients without notifying Cermack because Peoples Bank wanted to be sure that Cermack's accounts receivable were backed by invoices that matched the invoices that Cermack had presented to People's Bank for payment.
At trial, Cermack claimed he lost customers as a result of the verification letters. However, Cermack did not present any documentation at trial from these "lost customers" to establish his claim of lost business. Notwithstanding Cermack's claim, Bernie Smith, Cermack's expert, testified that it was not unusual for banks to confirm accounts receivable through "audit" letters. In fact, Cermack's expert testified that the letter sent by Peoples Bank to Cermack's customers were no different from other audit letters that he had seen. Given these facts, we cannot say under the totality of the circumstances that the verification letter sent by Peoples Bank to Cermack's customers demonstrated malice or gross neglect or a reckless disregard towards Cermack. Colonial Mortgage Co., Inc., 525 So.2d at 808.
Next, Cermack argues punitive damages were warranted because Peoples Bank waited over five months after Cermack bought the new trucks before it accelerated his loans. Cermack bought the trucks on March 31, 1988 and Peoples Bank informed Cermack that it was accelerating his loans in September of 1988. Thus, Cermack argues, the bank recklessly and arbitrarily demanded acceleration of the loans without regard for Cermack's rights.
The record does indicate that Cermack "informed" Peoples Bank of his purchase of the two new trucks by entering the truck debt in a journal entry on the profits and loss report for the first quarter of 1988. Uncontradicted trial testimony indicated that Peoples Bank, through an oversight of the bank officer supervising Cermack's account, did not discover that Cermack had purchased the trucks until July of 1988. Cermack never personally told Peoples Bank that he had purchased the new trucks. The record indicates that Peoples Bank had previously refused to finance trucks for Cermack.
Upon appellate review, we find nothing in the bank's decision to accelerate the loans indicating malice or gross neglect or a reckless disregard towards Cermack or Container. Colonial Mortgage Co., Inc., 525 So.2d at 808. After the bank learned of Cermack's purchase in July of 1988, it waited until September 7, 1988, to send out the acceleration letter. This delay allowed Peoples Bank adequate time to review Cermack's second quarter profit and loss report and determine how Cermack's breach of the contract would effect his cash-flow position. As Peoples Bank suspected, the purchase of the trucks worsened Cermack's cash-flow problems and in their estimation, threatened the repayment *1363 of the outstanding indebtedness Cermack had with the bank. Accordingly, the bank's decision to wait two months before accelerating Cermack's debt provided both legal and financial grounds on which to base their decision to accelerate.
Under the totality of the circumstances we cannot say that the bank's delay in notifying Cermack of its intention to accelerate the outstanding indebtedness warranted an award of punitive damages. Therefore, we find that the trial judge committed reversible error in allowing the submission of the punitive damages issue to the jury under the facts of this case. Colonial Mortgage Co., Inc., 525 So.2d at 808. Accordingly, the issue of punitive damages is reversed and rendered.

VII. THE COURT ERRED IN OVERRULING DEFENDANT'S OBJECTIONS TO THE TESTIMONY OF MARSHALL JENKINS CONCERNING CERTAIN DAMAGES ALLEGEDLY SUFFERED BY CONTAINER ENGINEERING.
Peoples Bank argues that the trial court committed reversible error in allowing Cermack's accountant Marshall Jenkins (hereinafter Jenkins) to testify that Container's total loss from the forced sale of the land and buildings was $410,000. Peoples Bank argues that Jenkins' testimony was misleading and therefore, its objection to Jenkins' testimony should have been sustained.
Expert testimony is admissible only if it helps the finder of fact understand the evidence or determine a fact in issue. Century 21 Deep South Prop. v. Corson, 612 So.2d 359 (Miss. 1992). At trial, Jenkins was qualified as an expert witness in the field of accounting and testified as to the damages that Cermack suffered as a result of Peoples Bank's alleged breach of contract.
Assuming arguendo, that Peoples Bank did indeed breach its contract with Container when it accelerated Container's debt, then Container is certainly entitled to demonstrate damages. Eastline Corp. v. Marion Apartments, Ltd., 524 So.2d 582, 585 (Miss. 1988). In Polk v. Sexton, 613 So.2d 841, 844 (Miss. 1993), this Court stated:
It is well established that when a person has been injured by a breach of contract, he is entitled to be justly compensated and is to be made whole by the trial court. However, it is never contemplated that the injured party be placed in a better position than he otherwise would have been in if the contract had been performed. In McDaniel Bros. Construction Co. v. Jordy, 195 So.2d 922 (Miss. 1967), this Court stated this principle as follows:
The fundamental principle of the law of damages is compensation for injuries sustained. One injured by a breach of contract is entitled to a just and adequate compensation and no more. "The law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken." 22 Am.Jur.2d Damages § 13 (1965).
In the case sub judice, after Peoples Bank accelerated Cermack's indebtedness (but never followed through with foreclosure), Cermack entered into a lease/buyback agreement with Megginson and Kinsey. Under the terms of the agreement Cermack could pay the lease payments on the property for fifteen years and at the end of the fifteen years, Cermack could buy the property back for one dollar. In fact, Cermack could tender the balance of the debt and one dollar at any time and Kinsey and Megginson would be legally obligated to deed the property back to Cermack.
Jenkins testified that Cermack's payments to the bank on the $170,000 indebtedness was $2,517 per month as of December 31, 1987. After "selling" its facility, Cermack paid $4,096 per month to Megginson and Kinsey to "rent" the facility. Jenkins testified that Cermack had to pay this sum monthly for 15 years to repay the $300,000 purchase price of the property. Jenkins testified that the difference between Cermack's pre-acceleration *1364 note with Peoples Bank and his post-acceleration "loan" with Megginson and Kinsey ($1,579.00) times 180 months (fifteen years) amounted to a negative cash flow of $284,220 over the fifteen year life of the repayment period. Jenkins also testified that the difference between the appraised value of the property, $426,800, and the actual sale price Cermack received, $300,000, was $126,800. Accordingly, Jenkins added the loss of equity ($126,800) to Cermack's increase in note payments of the Container facilities (284,220) and testified that Cermack's damages totalled approximately $410,000.
The problem with Jenkins' testimony is that it allows Cermack to receive a double recovery for his damages. Jenkins' testimony allows the jury to consider as damages Cermack's loss of equity ($126,800) on the "sale" of the property along with the additional "costs" ($284,220) Cermack will incur in "renting" his former facility from Megginson and Kinsey under the buyback agreement.
There are several problems with allowing Jenkins' testimony regarding the $284,220 additional cost incurred by Cermack in "renting" the property. First, the $284,220 figure is speculative and based upon conjecture. "This Court has stated that damages for breach of contract must be proven with reasonable certainty and not based merely on speculation and conjecture." Kaiser Investments v. Linn Agriprises, 538 So.2d 409, 415 (Miss. 1989), citing Leard v. Breland, 514 So.2d 778 (Miss. 1987).
At trial, Jenkins did not demonstrate that Cermack was required to lease the property for fifteen years. In fact, it appears from the lease that should Cermack decide to go out of business tomorrow, Cermack would have no further financial obligations to Megginson and Kinsey and therefore, he would not be responsible for the lease payments.
Another problem with the $284,220 figure is that it is not supported by Cermack's lease with Megginson and Kinsey. In fact, the lease provides that Cermack will pay $4,096 per month for the first year and thereafter, the payments shall be negotiated prior to the start of each new year. Thus, the $284,220 in "damages" Jenkins testified to is based upon the conjecture and speculation that Cermack will: (1) stay in business and rent the property from Megginson and Kinsey for fifteen years and, (2) not pay off the $300,000 "loan" early and thus reduce his interests costs. Accordingly, under the terms of Cermack's own lease/buyback agreement, the $284,220 figure is highly speculative and subject to conjecture and should not have been submitted to the jury.
The final problem with the $284,220 figure is that it "pyramids" Cermack's damages and allows for a double recovery. Container received $300,000 from Megginson and Kinsey for the purchase of the Container property. Cermack used $170,000 of this money to satisfy its debt with Peoples Bank and used the remaining $130,000 to fund the operation of his company. Jenkins' testimony allowed the jury to consider as damages the difference between Cermack's monthly note on the $170,000 loan with Peoples Bank and his monthly note on the $300,000 loan with Megginson and Kinsey.
The problem with this is that this computation does not take into consideration the fact that the Megginson and Kinsey note is for $300,000 whereas the Peoples Bank note was for $170,000. Cermack got the benefit and use of the additional $130,000 at the time he entered into the lease/buyback agreement on his property and now he seeks to have Peoples Bank compensate him for having spent the $130,000. Cermack used this $130,000 for the operation of his company. He did not "lose" this money. Cermack could have just as easily paid the $130,000 to Megginson and Kinsey to reduce his "rent" payments. Instead, Cermack used this money in his business and he now seeks to have Peoples Bank compensate him for his use of the $130,000.
Jenkins' testimony as to actual damages was speculative and based on conjecture. The testimony also allowed Cermack to be placed in a better financial position than he *1365 would have been in had Peoples Bank not breached the contract. Polk v. Sexton, 613 So.2d 841, 844 (Miss. 1993); McDaniel Bros. Construction Co. v. Jordy, 195 So.2d 922 (Miss. 1967). Jenkins' testimony was misleading and not supported by our case law. Therefore, we cannot say that Jenkins' testimony helped the trier of fact understand the evidence or determine a fact in issue. Century 21 Deep South Prop., supra. Accordingly, Peoples Bank's objection to this testimony should have been sustained.

VIII. THE COURT ERRED IN GIVING PLAINTIFF'S JURY INSTRUCTION NUMBER P-1.
Peoples Bank claims that Plaintiff's Jury Instruction P-1 was an insufficient statement of the law as it related to intentional infliction of emotional distress. Likewise, Peoples Bank argues that the facts of the case did not support an instruction on intentional infliction of emotional distress.
The challenged Plaintiff's Jury Instruction P-1 states:
If you find from a preponderance of the evidence that
1. Defendant Peoples Bank and Trust Company acted willfully or wantonly towards Jerry Cermack by requiring Cermack to fire his plant manager, Ricky Broadhead, and
2. Jerry Cermack suffered severe emotional distress as a direct result of the acts of Defendant Bank.
In Sears Roebuck & Co. v. Devers, 405 So.2d 898, 902 (1981), this Court addressed intentional infliction of emotional distress and stated:
Where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally-or even unintentionally, yet the results being reasonably foreseeable  Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. (emphasis added).
Likewise, the Restatement (Second) of Torts § 46 (1966) defines Outrageous Conduct Causing Severe Emotional Distress as:
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. (emphasis added).
Jury Instruction P-1, as given in this case, is an incomplete statement of Mississippi law. Instruction P-1 failed to instruct the jury that they had to find that Peoples Bank's conduct was wanton or willful and that it would evoke outrage or revulsion. Devers, supra. "It is, of course, error to grant a jury instruction that misstates the law applicable to a case." City of Jackson v. Keane, 502 So.2d 1185, 1187 (Miss. 1987).
However, upon reviewing the remaining jury instructions, we conclude that Jury Instruction D-7 accurately states Mississippi law as to intentional infliction of emotional distress. Therefore, upon viewing the defective instruction in light of all of the other instructions given at trial, we must reject Peoples Bank's argument that the jury was not properly instructed as to the requisite elements for a case of intentional infliction of emotional distress. Rester v. Lott, 566 So.2d 1266, 1269 (Miss. 1990).
Nonetheless, even though Defendant's Jury Instruction D-7 correctly apprised the jury of the applicable law, we find that the facts of this case do not support an award of damages for intentional infliction of emotional distress. Cermack's argument that he was entitled to an instruction on intentional infliction of emotional distress is simply not supported by the facts in the record.
Cermack claims that Peoples Bank's conduct was extreme and outrageous because they forced him to fire Ricky Broadhead, his plant manager. However, the record clearly demonstrates that the idea to terminate *1366 Broadhead was Cermack's. In 1987, Peoples Bank told Cermack that before they would refinance his debt, he would have to reduce his fixed operating costs by $35,000. Cermack's first proposal to reduce the necessary expenses was rejected. Subsequently, Cermack submitted a proposal that included laying off Broadhead. The bank accepted this proposal.
The record indicates that Cermack was free to submit other cost cutting proposals to Peoples Bank for their approval. Never once did Peoples Bank tell Cermack that he had to lay off his plant manager. The decision was Cermack's alone. In fact, the record indicates that after the bank rejected Cermack's first offer, he did not attempt to submit another proposal that would not have included laying off Broadhead. Therefore, nothing in the record supports a finding that the bank's actions were wanton and willful and would cause outrage or revulsion. Devers, 405 So.2d at 902. Accordingly, the facts of this case do not support an instruction on intentional infliction of emotional distress, and it was reversible error for the judge to so instruct the jury. Munford, Inc. v. Fleming, 597 So.2d 1282, 1286 (Miss. 1992).

CONCLUSION
In the case at bar, the record and evidence indicated that Container was a chronically undercapitalized corporation that experienced recurring cash-flow problems. Peoples Bank, faced with Cermack's breach of contract and the accompanying aggravation of Cermack's cash-flow problems, accelerated Cermack's outstanding indebtedness. We hold that the evidence in the record was insufficient to support an instruction on punitive damages, intentional infliction of emotional distress, fiduciary duty or negligence. The lower court erred in giving these instructions. We also hold that Marshall Jenkins' testimony was confusing and legally incorrect in that it would have allowed Cermack to recover double damages.
Accordingly, for the above stated reasons, it is the decision of this Court that the jury's verdicts be set aside and that this case is reversed and remanded for a new trial or other disposition not inconsistent with this opinion.
REVERSED AND REMANDED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., concurs in result only.
NOTES
[1] Jerry Cermack is the sole owner of Container Engineering Corporation.
[2] The restructuring of Container's existing debt was going to save Container approximately $500.00 per month. However, based upon data supplied by Container, Peoples Bank determined that Container would still experience a negative cash flow in the neighborhood of $34,000 even if Peoples Bank restructured Container's pre-existing debt.
[3] Peoples Bank had extended Container a $140,000 line of credit on its accounts receivable. Container could present a billing invoice signed by its customer to Peoples Bank, and the bank would advance Container 70% of the amount due Container from its customer. When Container received a payment from its customers, they forwarded the check to Peoples Bank and the bank would then apply the money received to Container's indebtedness with Peoples Bank.