# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01478-SCT

*MARINER HEALTH CARE, INC.; GRANCARE, INC.; EVERGREEN HEALTHCARE, INC.; NATIONAL HERITAGE REALTY, INC.; GEORGE D. MORGAN; M. SCOTT ATHANS; J. D. LEE; CHARLIE R. SINCLAIR, JR.; ANGELA M. WHITTINGTON; AND JOHN H. MERRELL*

*v.*

*ESTATE OF CHARLES E. EDWARDS, BY AND THROUGH NEVONNIA TURNER, ADMINISTRATRIX OF THE ESTATE OF CHARLES E. EDWARDS, FOR THE USE AND BENEFIT OF THE ESTATE OF CHARLES E. EDWARDS, AND FOR THE USE AND BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF CHARLES E. EDWARDS, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/18/2004 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM W. McKINLEY, JR. |
| | LORRAINE BOYKIN |
| ATTORNEYS FOR APPELLEE: | D. BRYANT CHAFFIN |
| | SUSAN NICHOLS ESTES |
| | KENNETH L. CONNOR |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 09/13/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.	The present case concerns a wrongful death claim against a nursing home and its parent companies. We find that the failure to investigate alleged juror misconduct, the admission of improper evidence, and the failure to distinguish among defendants compel us to reverse the judgment for the Plaintiff and remand the case for further proceedings.

**FACTS**

¶2.	Charles Edwards was admitted to the Greenwood Health and Rehabilitation Center on December 27, 1994. He was forty years old, and due to childhood brain damage was severely mentally retarded and suffered from severe autism, grand mal seizure disorder, and a swallowing disorder that had led to chronic pneumonia. He had an estimated I.Q. of 13 and a mental age of two years and three months. He could not speak and had never attended school. Throughout most of his life, he was able to feed himself, walk and run, and use the toilet without assistance. However, prior to his admittance to Greenwood Health, his health had deteriorated, he had difficulty walking, and he was increasingly unresponsive to family members.

¶3.	In October 1996, Greenwood Health recommended that Edwards have a PEG feeding tube inserted into his stomach, because he was refusing food orally and had lost significant weight. Though Edwards's family initially refused to authorize the insertion of the feeding tube, by April 1997 they had accepted the necessity of the procedure. Initially, Edwards responded well to PEG feeding, but by October 1998, his body had stopped processing the nutrients delivered through the tube. Between April 1999 and June 1999, Edwards was hospitalized for gastrointestinal bleeding, and by August 1999 had lost twenty-two pounds. Edwards's condition deteriorated steadily. From May 2001 until February 2002, Edwards

2

spent 188 days in the Greenwood-Leflore Hospital. Intravenous feeding was not ordered until Edwards's final hospitalization on February 2, 2002. Edwards died on February 16, 2002, from cardiac arrest caused by pneumonia, which was in turn the result of volume depletion, a condition caused by a lack of liquid in the body's cells.

¶4. On December 7, 2001, Edwards's family brought suit for compensatory and punitive damages against National Heritage Realty, the owner of Greenwood Health, its parent companies, Grancare, Inc., Evergreen Healthcare, and Mariner Healthcare, Inc., and against five individuals in their capacities as administrators or licensees of Greenwood Health.[1] The complaint alleged negligence, medical malpractice, gross negligence, fraud, and breach of fiduciary duty. After Edwards's death, the family amended its complaint to include a claim for wrongful death. The trial began on December 8, 2003. The jury found each of the defendants liable for Edwards's death, and awarded $1.5 million in compensation. Subsequently, the trial judge determined that the jury should be allowed to consider punitive damages, and, after considering the evidence, the jury awarded $5 million in punitive damages. Mariner raises eleven issues on appeal, which we have consolidated into seven.

## DISCUSSION

## I. DENIAL OF JUDGMENT NOTWITHSTANDING THE VERDICT

¶5. Greenwood Health first argues that the trial court erred in denying its motion for Judgment Notwithstanding the Verdict (JNOV). Mariner contends that Edwards's estate

---

[1]Though distinctions among the individual defendants will be important in this opinion, for the sake of convenience, when referring to all of the defendants, we will use the term "Mariner."

failed to present a prima facie case for liability because the Estate's expert, Dr. Kenneth Olson, did not establish that the negligence of the nursing home was the proximate cause of Edwards's death.

¶6.     This Court reviews the grant or denial of a motion for directed verdict de novo, and will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. **Whitten v. Cox**, 799 So. 2d 1, 7 (Miss. 2000). So long as substantial evidence supports the verdict, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, then this Court will affirm. **Id.**

¶7.     In determining whether the negligence of a party caused a plaintiff's injuries, this Court has held that:

> That negligence which merely furnished the condition or occasion upon which injuries are received, *but does not put in motion the agency by or through which the injuries are inflicted*, is not the proximate cause thereof. However, if an antecedent negligent act puts in motion an agency which continues in operation until an injury occurs it would appear to be more like a second proximate cause than a remote and unactionable cause.

**Eckman v. Moore**, 876 So. 2d 975, 981-82 (Miss. 2004) (citations omitted) (emphasis added).

¶8.     In cases alleging that death was caused by the negligence of a health care provider, proximate cause must be established by a medical doctor. **Richardson v. Methodist Hosp. of Hattiesburg, Inc.**, 807 So. 2d 1244, 1248 (Miss. 2002). This Court does not require that expert testimony conclusively establish the cause of death. **Blake v. Clein**, 903 So. 2d 710,

4

731-32 (Miss. 2005); *Stratton v. Webb*, 513 So. 2d 587, 590 (Miss. 1987). However, expert testimony must, at a minimum, show that deviations from the standard of nursing care caused or contributed to the decedent's death. *Richardson*, 807 So. 2d at 1248.

¶9. Dr. Kenneth Olson testified that Greenwood Health breached the standard of care in failing to monitor Edwards's nutritional needs and bowel movements, in failing to recommend intravenous feeding, known as "TPN feeding," to the center's medical director, and in not recommending that Edwards be transferred to a multiple-specialty facility to address his worsening condition. He further opined that the failure of the nursing home to recommend the TPN treatment was a contributing cause of Edwards's death.

¶10. Dr. Olson's testimony did not conclusively establish the liability of the nursing home. He admitted that, in his deposition prior to trial, he stated that the nursing home did not breach the standard of care in its feeding program. He admitted that from 1999 until his death in 2002, Edwards was spending increasing amounts of time in the Greenwood-Leflore Hospital, and that half of all hospital patients are malnourished because of their treatment. Finally, he admitted that no doctor at Greenwood-Leflore ordered TPN treatment until 2002, despite the fact that the hospital staff had ample time to determine whether such a procedure was necessary.

¶11. Considered as a whole, Dr. Olson's testimony was sufficient to present a prima facie case for the liability of Greenwood Health. He testified to a causal nexus between the actions of Greenwood Health and Edwards's death. While he did not rule out the possibility that other parties were liable, his testimony that the negligence of Greenwood Health contributed to Edwards's death is sufficient to establish proximate cause. Viewed in the light most

5

favorable to Edwards's estate, the trial court did not abuse its discretion in denying the motion for a judgment notwithstanding the verdict. This assignment of error is therefore without merit.

## II.  DENIAL OF MOTION TO CONTACT JURORS REGARDING ALLEGED JUROR MISCONDUCT

¶12.  On December 27, 2002, after the jury rendered a verdict for Edwards's estate, Mariner was contacted by one of the jurors, Juror "B," who alleged that another juror, Juror "W," had made prejudicial statements during the trial and in jury deliberations. Juror B alleged in an affidavit that Juror W, on the first day of trial, said that "she had made up her mind in favor of the plaintiff; that she could not wait to give money to the plaintiff; and that there was nothing anyone could say that could change her mind." The affidavit alleged several other statements, including: (1) that Juror W knew a resident at Greenwood Health, who to the affiant's best recollection was Juror W's relative; (2) that she had personally witnessed this resident lying in her own waste and receiving poor care, and that because that resident had received poor care, Edwards must also have received poor care; and (3) that Juror W saw other residents unknown to her receive poor care when she visited the nursing home. Furthermore, the affiant referred to general comments by jury members that "white people have been taking black people's money and black people have figured out that lawsuits are the way to get the money back," and that "jurors needed to stick together to get the money back to black people and that money should be given in this case because the plaintiff was

6

black."[2] The affidavit did not precisely clarify which jurors made these statements. Such remarks are attributed to "juror comments" and were apparently made by multiple jurors. The affidavit implictly included Juror W among those who made such statements. Nevertheless, even if Juror W never made these comments, the other statements that were directly attributed to Juror W are material to the issue at hand.

¶13.  Relying on this affidavit, Mariner moved to contact additional jurors and to stay the judgment until an inquiry had been conducted. The trial court ruled that the juror's affidavit was not competent evidence because it failed to allege impermissible external influences and that, even if the statements had in fact been made, they represented the juror's knowledge of the witnesses and the case and, as such, did not constitute the sort of outside influence contemplated by Mississippi Rule of Evidence 606(b). The trial court therefore denied Mariner's motions and entered its final judgment. On appeal, Mariner contends that the trial court erred in denying its motion to contact additional jurors.

¶14.  Rule 606(b) of the Mississippi Rules of Evidence prohibits jurors from testifying to statements made during jury deliberations, subject to an exception for extraneous prejudicial information, not brought out at trial, that was improperly put before the jury. M.R.E. 606(b). This prohibition on the impeachment of juries is crucial to the viability of our legal system, since it protects the jury's ability to candidly discuss issues free from the fear that they will be called to justify their decision. *Salter v. Watkins*, 513 So. 2d 569, 571 (Miss. 1987). The rule is designed both to prevent the harassment of jurors and to prevent a juror from

---

[2] The affidavit did not specify whether these other statements were made during the trial or in jury deliberations.

7

remaining silent during deliberations and later asserting improper influence. *Id*. Consequently, while a juror may testify whether outside influence or information was improperly presented before the jury, Rule 606(b) categorically prohibits testimony regarding specific statements made during jury deliberations or any influence such information had on his or her mental processes. *Id*.

¶15. A trial court is obligated to investigate an allegation of misconduct when the party alleging misconduct makes a showing of extrinsic evidence sufficient to overcome the presumption of jury impartiality. *United States v. Infelise*, 813 F. Supp. 599, 605 (N.D. Ill. 1993). Where a party fails to make this threshold showing, no inquiry into the jury's verdict is required. *Tanner v. United States*, 483 U.S. 107, 117-27, 107 S. Ct. 2739, 2745-51; 97 L. Ed. 2d 90, 103-11 (1987). A new trial is appropriate only when the jury received facts that concern a material issue in dispute and they are qualitatively different from the evidence admitted at trial. *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 412 (Miss. 1993). In determining whether outside information is prejudicial, reversal is warranted where there is overwhelming evidence that a juror withheld information for which he or she would have been challenged by one of the parties and subsequently relayed that exact disqualifying information to the jury during deliberations. *T. K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 950 (Miss. 1992).

¶16. In the present case, the trial court found that the juror's affidavit was not competent because it concerned the mental impressions of a juror during deliberations. In the alternative, the trial court held that a new trial was not warranted because information about the alleged mistreatment of other residents of the nursing home was not qualitatively

8

different from the evidence put on by Edwards's estate. While the affidavit did contain information regarding the mental impressions of both the speaker and the allegedly offending juror, it also specifically alleged that the juror failed to truthfully answer questions during voir dire.

¶17. The standard for the review for juror misconduct arising from a failure to respond to questions during voir dire is as follows:

> Where a prospective juror in a criminal case fails to respond to a question by defense counsel on voir dire, the Court should determine whether the question was (1) relevant to the voir dire examination, (2) whether it was unambiguous, and (3) whether the juror had substantial knowledge of the information sought to be elicited. If all answers to the above questions are affirmative, then the court determines if prejudice to the defendant in selecting the jury could be inferred from juror's failure to respond.

*Barker v. State*, 463 So. 2d 1080, 1083 (Miss. 1985) (citing *Odom v. State*, 355 So. 2d 1381 (Miss. 1978)). Though this test has been applied almost exclusively in criminal trials, it is equally applicable to allegations of juror misconduct in civil suits. *See Stanley*, 614 So. 2d at 948; *Salter v. Watkins*, 513 So. 2d 569, 573 (Miss. 1987). In *Stanley*, the defendant corporation moved for a new trial after submitting an affidavit that alleged one of the jurors had said during recesses that she knew the plaintiff, that the plaintiff should get the money, and that the vice president of the defendant company could not be trusted. *Id*. The defendant's motion also alleged that the juror had failed to disclose that her brother had been killed while working for the defendant. *Id*. The trial court allowed the parties to question the juror. The juror admitted that she knew the plaintiff, but denied speaking about the parties to any other jurors before deliberation. *Id*. The trial court ruled that the defendant's voir dire questions were not specific enough to make the juror's failure to disclose her

9

knowledge reversible error, and declined to address allegations of misconduct during jury deliberations. *Id*. at 949. We reversed, finding that "[t]he evidence is overwhelming that [the juror] withheld material information during voir dire which would have resulted in her being challenged by [the defendant], then relayed that exact disqualifying information to the other members of the jury during deliberations." *Id*. at 950. In doing so, we emphasized that "where, as a matter of common experience, a full and correct response would have provided the basis for a peremptory challenge, not rising to the dignity of a challenge for cause, our courts have greater discretion, although a discretion that should always be exercised against the backdrop of our duty to secure to each party trial before a fair and impartial jury." *Id.* at 949 (citing *Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990)).

¶18. The alleged misconduct in the present case is similar to that found to be reversible error in *Stanley*. During voir dire there were at least two instances in which the juror withheld material disqualifying information. First, in the context of assuring that venire members could reach a verdict based solely on the law and evidence presented at trial, plaintiff's counsel asked, "[I]s there anybody who has any reason to feel that there is any reason that we haven't touched on, that you feel that we ought to know that would adversely impact your ability to serve as a juror in this case, that we haven't discussed thus far?" Second, plaintiff's counsel later asked, "Is there anyone here who just the mention of a nursing home invoke [sic] negative feelings, negative experiences?" The juror in question did not raise her hand or otherwise indicate that she had any experience with nursing homes. The question by defense counsel was relevant, unambiguous, and the juror had substantial

10

knowledge of the information requested. If accurate, her statement on the first day of trial that she had already decided for Edwards's estate clearly belied her implied impartiality.

¶19. There is no unbending rule for every situtation that might arise on the voir dire of prospective jurors. *Odom*, 355 So. 2d at 1383. Rather, each case must be decided based on the facts presented. *Id*. Additionally, we must consider the relationship between the question posed and the juror's knowledge. *See **Buckley v. State***, 772 So. 2d 1059, 1064 (Miss. 2000) (question during voir dire was ambiguous "as it related" to a particular juror); ***T. K. Stanley, Inc. v. Cason***, 614 So. 2d 942, 949 (Miss. 1992) (question on voir dire should have elicited a response in light of juror's knowledge).

¶20. The allegations listed in the affidavit therefore met the threshold for a judicial inquiry, and the trial court erred in refusing to conduct one. We find that, in this case, the failure to investigate juror misconduct jeopardized the parties' right to a fair and impartial trial, and that consequently the judgment must be reversed.

### III. FAILURE TO CONDUCT A SEPARATE EVIDENTIARY HEARING AND FAILURE TO EXCLUDE PREJUDICIAL EVIDENCE FROM THE COMPENSATORY PHASE OF THE TRIAL

¶21. In pretrial motions, Mariner moved to exclude various "types" of evidence, including evidence of Mariner's corporate practices, evidence of patterns of care unrelated to Edwards, and errors in the nursing home's documentation that did not affect Edwards. The trial court found these motions vague and reserved judgment on the admissibility of specific evidence until trial. After the jury found in favor of Edwards's estate, the trial court considered the information that had been presented, and ruled that the issue of punitive damages should be presented to the jury. On appeal, Mariner argues that the trial court erred in not excluding

11

prejudicial information during the compensatory phase of the trial and in relying on evidence introduced during the compensatory phase to determine whether consideration of punitive damages was warranted.

¶22.    When deciding whether to submit the issue of punitive damages to a trier of fact, the trial court looks at the totality of the circumstances, as revealed in the record, to determine if a reasonable, hypothetical trier of fact could find either malice or gross neglect and reckless disregard. *Bradfield v. Schwartz*, 936 So. 2d 931, 936 (Miss. 2006) (citing *Ross-King-Walker, Inc. v. Henson*, 672 So. 2d 1188, 1191 (Miss. 1996)).  The trial court's determination whether a case warrants the consideration of punitive damages will not be overturned absent an abuse of discretion. *Id*. (citing *Doe ex rel. Doe v. Salvation Army*, 835 So.2d 76, 81 (Miss. 2003).  Evidence which does not pertain to compensating the plaintiff but instead seeks to show the malicious or grossly negligent character of the defendant's actions should not be heard by the jury until liability has been determined. *Bradfield*, 936 So. 2d at 938.  Evidence may, of course, be probative of both liability and the assessment of punitive damages.  Similarly, evidence may be deemed inadmissible during the compensatory phase of trial but relevant during the evidentiary hearing on punitive damages. In making determinations about the relevance of evidence to the liability of the parties, we are guided by the underlying purpose of bifurcation to "prevent issue confusion and to create a barrier between testimony regarding the fundamental issue of liability and the inflammatory issue of egregious conduct." *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 897 (Miss. 2006).

¶23.    The failure to conduct an evidentiary hearing on punitive damages, where the plaintiff has sought such damages and the jury has awarded compensatory damages, constitutes reversible error. *See **Bradfield***, 936 So. 2d at 938. Similarly, the failure to bifurcate a case involving claims for punitive damages may constitute reversible error. ***Hartford***, 936 So. 2d at 897. However, the trial court in this case properly conducted an evidentiary hearing after the jury returned a verdict for compensatory damages in favor of Edwards's estate. The trial judge heard the evidence presented during the compensatory damages phase of the trial and determined that consideration of punitive damages was appropriate. Mariner's claim that the trial court failed to conduct a hearing is not supported by the record, and the assignment of error is without merit.

¶24.    Mariner also argues that the trial court erred in admitting evidence relevant only to punitive damages during the compensatory phase of the trial. As noted above, the trial court did not deny Mariner's motions in limine, but directed counsel to raise objections when the specific evidence was presented. During Edwards's case-in-chief, Mariner did object to plaintiff's counsel reading into the record the deposition of Roy Dumas, a regional vice-president of the company. Mariner argued that the introduction of the evidence involved "two other cases involving other facilities, and [plaintiff's counsel] is seeking parts of this deposition for some generalized testimony, [and] it's not necessarily applicable to this case." Dumas testified about various aspects of the Mariner corporate structure, including a compensation system that was tied to economic efficiency, his own duties, his focus on the financial condition of the nursing homes rather than the instances of weight loss and pressure sores, and the company's "four C's": care, cost, census, and cash, which were supposed to

13

guide their business decisions. As a theory of their case throughout trial proceedings, plaintiff's counsel relied on this testimony and the testimony of Mariner's senior vice president and treasurer, Boyd Gentry, to portray Mariner as a company focused on financial success rather than competent care.

¶25. The standard of review regarding the admission or exclusion of evidence is abuse of discretion, and error will not be deemed reversible unless the error adversely affects a substantial right of a party. *Whitten*, 799 So. 2d at 13. Edwards's estate argues that evidence of general corporate practices was necessary to demonstrate that Mariner's budgeting policies caused Edwards's injuries and death. However, Edwards's estate submitted no evidence that would establish a causal connection between the budgeting policies of Mariner and the injuries and death suffered by Edwards. The estate did not show that Greenwood Health was understaffed because of the budgeting policies, nor that Greenwood Health had been denied funding by Mariner.

¶26. The information in the depositions of Gentry and Dumas would certainly have been relevant at the punitive phase to establish whether Edwards's treatment was an aberration or consistent with company practice. However, the testimony was not probative to the issues of duty, breach, causation, or injury. Given the use of the testimony at trial to emphasize the "bad corporate character" of Mariner, we find that admission of the testimony materially prejudiced the defendants. In light of this prejudice, the jury's verdict must be reversed.

## IV. EVIDENTIARY RULINGS

¶27. Mariner argues that the trial court erred in admitting evidence of short-staffing, wage rates, and alcohol consumption. They contend that Edwards's estate provided no

14

testimony that connected such evidence and Edwards's injuries and death. In the alternative, they argue that such information was relevant only at the punitive damages phase of the trial. As noted above, the admission or exclusion of evidence is reviewed for an abuse of discretion. *Whitten*, 799 So. 2d at 13.

### A. Generalized Evidence of Short-Staffing

¶28. Mariner first claims that the trial court erred in admitting testimony from nursing assistants that they felt overwhelmed and had trouble providing competent care. Mariner argues that such testimony is inadmissible unless the alleged short-staffing caused the assistants to give inadequate care specifically to Edwards. The argument is misplaced. Each of the nursing assistants who testified for Edwards's estate had been responsible for Edwards's care at some point during his time at Greenwood Health. Several of them testified that understaffing prevented them from turning Edwards as often as was necessary to prevent bedsores. One nursing assistant testified that she was not able to change Edwards as often as she should have because of short-staffing. Another alleged that the assistant whose shift came before hers gave Edwards substandard care. All of the assistants testified that they witnessed Edwards's deterioration.

¶29. Mariner correctly notes that the Court of Appeals has held that generalized testimony of short-staffing that does not show a casual nexus between staffing and a plaintiff's injuries is not probative to the question of liability. *Estate of Finley v. Beverly Health & Rehab. Servs.*, 933 So. 2d 1026 (Miss. Ct. App. 2006). However, in *Finley*, summary judgment was appropriate in part because none of the nursing assistants "could recall any specific instance where [the resident] received substandard care as a result of

15

shortages in staffing or lack of supplies." *Finley*, 933 So. 2d at 1036. In the present case, several assistants testified that they either provided or saw the effects of substandard care on Edwards. Such testimony is therefore probative under Mississippi Rule of Evidence 401.

### B. Testimony Regarding Wage Rates and Allegations of Alcohol Consumption in the Workplace

¶30. Mariner argues that testimony from nursing assistants that their wages were insufficient was inadmissible. They also contend that testimony from one nursing assistant that she once smelled alcohol on the breath of the director of nursing at the workplace was inadmissible. However, Mariner failed to object to either line of testimony when it was introduced. Failure to make a contemporaneous objection at trial constitutes a waiver of any error subsequently assigned. M.R.E. 103(a)(1); *Moore v. State*, 799 So. 2d 89, 92 (Miss. 2001).

### C. Admission of the Family Journal

¶31. Edwards's family kept a journal at the nursing home in which they would record their observations, thoughts, and feelings about Edwards and his care.[3] Staff members were aware of and occasionally wrote in the journal. Plaintiff's counsel repeatedly attempted to introduce the journal into evidence during their case-in-chief. The trial court allowed Edwards's estate to use the journal to refresh family members' recollections, but reserved ruling on its admissibility. At the end of Mariner's defense, the trial court found

---

[3]The journal was comprised of multiple notebooks which Edwards's estate characterized as "family journals" or "journal," and Mariner characterized as a "diary."

16

that the journal was admissible under Mississippi Rule of Evidence 801(d)(1) to rebut the inference of recent fabrication and also under Rule 803 as an exception to hearsay. The trial judge also found the journal was more probative than prejudicial under Rule 403. The trial court did not specify under which of the hearsay exceptions to Rule 803 the journal fell. Edwards's estate argues that, if the journal is not admissible under Rule 801(d)(1) as a prior consistent statement, it is admissible under Rule 803(1) as a collection of present-sense impressions.

¶32.   Under Rule 801(d)(1), a prior consistent statement will not be deemed hearsay so long as (1) the witness testifies at trial and is subject to cross-examination concerning the statement, and (2) the statement is offered to rebut an express or implied charge of recent fabrication or improper influence or motive. M.R.E. 801(d)(1). The availability of the witness is therefore a prerequisite for the introduction of a prior consistent statement. The Edwards's family journal contains a number of entries by Edwards's sister Shirley Powell, who was deceased by the time of trial. Those portions of the journal could not have been introduced to rebut an inference of recent fabrication because there was no testimony at trial to rebut. Because the trial court did not distinguish between statements made by testifying family members and non-testifying family members, it was error to find that journal entries made by non-testifying family members were not hearsay under Rule 801.

¶33.   The trial court also found the journal admissible under the present-sense impression exception to the hearsay rule. *See* M.R.E. 803(1). Exceptions to the hearsay rule, unlike statements which are not hearsay under Rule 801, are exempt from the

availability rule. Present-sense impressions are exempted from the rule against hearsay because the contemporaneousness of the occurrence of the event and the statement render it unlikely that the declarant made a deliberate or conscious misrepresentation. M.R.E. 803(1) cmt. 1.

¶34. To be admissible as a present-sense impression, a given statement must meet three requirements: First, the statement must be made while the event or condition is being perceived by the declarant or "immediately thereafter"; second, the declarant must "perceive" the event or condition; and finally, the statement must describe or explain the event or condition. M.R.E. 803(1); *see also* **Peterson v. State**, 518 So. 2d 632, 640 (Miss. 1987). A crucial element of the reliability of a present-sense impression is its spontaneity. The determination of spontaneity "is a question for the trial judge whose action in admitting the statement should not be held to be error unless this Court would be justified in concluding that under all and any reasonable interpretation of the facts the explanation could not have been spontaneous." **Evans v. State**, 547 So. 2d 38, 41 (Miss. 1989) (quoting **Harris v. State**, 394 So. 2d 96, 98 (Miss. 1981)).

¶35. Given the strong deference owed to the trial court, we do not find that admission of the journal constituted reversible error. Most of the journal entries indicate the date and time of the entry so that the trial judge could reasonably have interpreted such entries as being spontaneous. However, we note that Edward's estate presented no evidence and the trial judge conducted no inquiry to verify that *each entry* in the journal was contemporaneous with family members' observations of Edwards. While such an inquiry may be burdensome, "spontaneity" is required for the admissibility of any evidence under

18

the present-sense impression to the hearsay rule and, as a general practice, should be more thoroughly inquired upon in the future. *See* M.R.E. 803(1); *see also **Peterson v. State***, 518 So. 2d 632, 640 (Miss. 1987). Nevertheless, in this case, we find support that the journal entries were, as a whole, contemporaneous and that the trial court did not commit reversible error in admitting the journal.

### D.    Exclusion of Labor-Hour Reports

¶36. During discovery, Edwards's estate requested all daily time sheets that documented the day-to-day staffing levels at Greenwood Health and filed a motion to compel production after the daily time sheets were not produced. Mariner maintained that the daily time sheets had not been preserved, but provided weekly summaries of staffing levels that had been produced in the normal course of business. Two days before trial, Mariner delivered more than 10,000 pages of records to defense counsel, including the daily time sheets in question. Defense counsel maintained that the failure to timely produce the time sheets was an inadvertent error. Edwards's estate moved to exclude the weekly labor-hour summaries, arguing that there was not enough time to verify their accuracy against the daily time sheets. The trial judge considered the admissibility of the labor-hour reports on the second day of trial. He questioned whether a continuance could remedy the discovery violation, but ultimately found that the failure to produce the daily time sheets materially prejudiced Edwards's estate, and he therefore excluded them. He further determined that the labor-hour reports had to be excluded because they could not be verified against the daily time sheets.

19

¶37. The appropriateness of discovery sanctions, like other evidentiary rulings, rests within the sound discretion of the trial court, and will be reversed only if that discretion is abused. *M & M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So. 2d 615, 620 (Miss. 1988). We have articulated the procedure for addressing a discovery violation:

> Under our rules of civil procedure, failure to make or cooperate in discovery should first be resolved by making a motion in the proper court requesting an order compelling such discovery. The remedy for failing to comply with the discovery requests when the trial court grants an order to compel falls under M.R.C.P. 37(a)(4) in the form of awarding the moving party the expenses for such motion. After such an order to compel has been granted under M.R.C.P. 37(a)(2), and the party ordered to answer fails to respond, then the remedy may be sanctions in accordance with M.R.C.P. 37(b).

*Caracci v. Int'l Paper Co.*, 699 So. 2d 546, 557 (Miss. 1997) (internal citations omitted). One possible sanction is issuing an order "prohibiting [the offending party] from introducing designated matters in evidence." M.R.C.P. 37(b)(2)(B). However, the exclusion of evidence is a last resort. *McCollum v. Franklin*, 608 So. 2d 692, 694 (Miss. 1992). "Every reasonable alternative means of assuring the elimination of any prejudice to the moving party and a proper sanction against the offending party should be explored before ordering exclusion." *Id*.

¶38. The exclusion of the labor-hour reports was well within the discretion of the trial court. The trial judge considered whether a continuance to review the daily time sheets would cure the prejudice to Edwards's estate, determined that a continuance would push the trial back almost a year, and ruled that the only means of preventing prejudice was to exclude the time sheets. The labor-hour reports were compiled from the daily time

20

sheets, but provided only averages of the work hours provided to residents each week, and did not preclude the possibility that the nursing home was understaffed on a given day. The trial judge therefore ruled that the admission of the labor-hour reports was inappropriate once the daily time sheets had been excluded. Mariner's reliance on *Ferguson v. Snell*, 905 So. 2d 516 (Miss. 2004), is misplaced. The summary reports in *Ferguson* were created by a computer automatically generating information. *Id* at 520. In that case, it was unnecessary to call as witnesses the individuals who input the information into the computer system, in part because there was no real question whether the information produced differed from the information entered into the system. *Id*. In the present case, by contrast, there was significant contention whether the labor-hour reports accurately depicted the level of care at Greenwood Health, since the reports presented averages that did not preclude short-staffing on a given day. Given the importance of the issue of staffing at trial, and in light of the seriousness of Mariner's discovery violation to the case, the trial court did not err in excluding the labor-hour reports from evidence.

### E. Partial Exclusion of Testimony of Dr. Wood Hiatt

¶39. Edwards's estate proffered Dr. Wood Hiatt, a licensed doctor and psychiatrist, as an expert on the effects Edwards's profound handicaps had on his life and the limitations those handicaps would place on a caregiver's ability to provide treatment to him. Mariner objected to Hiatt's designation as an expert in general medicine, arguing that he had not practiced general medicine in thirty-four years and did not possess the requisite knowledge about Edwards's treatment options. After allowing both sides to explore

Hiatt's qualifications, the trial court ruled that Hiatt was qualified to offer opinions about Edwards's retardation, but could not testify to matters of general medicine.

¶40. The decision whether an expert is qualified rests in the sound discretion of the trial court. *Smith v. State*, 530 So. 2d 155, 162 (Miss. 1988). Rule 702 of the Mississippi Rules of Evidence states that, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The relevant inquiry is therefore "whether the particular witness really is an expert in the field in which he or she is tendered." *Stanley*, 614 So. 2d at 951; *Harris v. Shields*, 568 So. 2d 269, 272 (Miss. 1990).

¶41. Edwards's estate argues that Hiatt has been accepted as an expert in general medicine in numerous cases, and that we have never before questioned his qualifications. This contention misses the point. While at least one case held an expert qualified based on a previous designation by this Court, *see Stanley*, 614 So. 2d at 951, nothing in Rule 702 would prevent two trial judges in the exercise of seasoned consideration from coming to two different conclusions regarding the qualification of an expert. The parties conducted an extensive voir dire of Hiatt's qualifications to testify to the treatment that should have been provided to Edwards in light of his extreme weight loss. The trial judge ruled that Hiatt was not familiar enough with those treatment options to offer an expert opinion. There was no error in partially excluding his testimony.

## V. JURY INSTRUCTIONS

¶42. Mariner contends that the trial court erred in granting jury instructions nine, ten, and nineteen.[4] Instructions Nine and Ten defined "abuse" and "neglect" as those terms are found in the Mississippi Vulnerable Adults Act, Mississippi Code Annotated Section 43-47-5 (Rev. 2002), and stated that the defendant or defendants were liable if the jury found that either abuse or neglect of Edwards had occurred due to that defendant's or defendants' actions. Instruction Nineteen listed a number of the federal regulations related to care that are applicable to long-term care facilities, and stated that any violation of those regulations could be considered as evidence of negligence. In considering whether the grant or refusal of an instruction constitutes reversible error, we read the instructions actually given as a whole and will not reverse a verdict so long as the instructions, taken together, fairly announce the law of the case and create no injustice. *Whitten v. Cox*, 799 So. 2d 1, 16 (Miss. 2000). Defects in specific instructions do not require reversal "where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." *Peoples Bank & Trust Co. v. Cermack*, 658 So. 2d 1352, 1356 (Miss. 1995). However, if those instructions do not fairly or adequately instruct the jury, we will reverse. *Id.*

**A.      Use of State and Federal Regulations to Inform the Standard of Care**

¶43. Mariner argues that the jury instructions amounted to the creation of a cause of action in violation of the well-recognized principle that statutes in derogation of the common law are strictly construed and do not extend liability beyond that which is clearly

---

[4]The precise language of these instructions is, of course, crucial. Because of their length, they have been appended to this opinion.

23

indicated by their express terms. *See Warren v. Glascoe*, 880 So. 2d 1034, 1037 (Miss. 2004). However, the instructions did not purport to create a cause of action based on the so-called Minimum Standards. Instead, the instructions used the definitions of "abuse" and "neglect" adopted by the Legislature to help establish the standard of care for a nursing home.

¶44. Edwards's estate argues that the definitions of abuse and neglect are proper given this Court's principle that violations of statutes can be introduced as evidence of negligence. *See*, *e.g.*, *Accu-Fab & Constr., Inc. v. Ladner*, 778 So. 2d 766, 771 (Miss. 2001), (use of OSHA regulations was not error where they were admitted not to show negligence but as a measure of reasonable care consistent with industry standards), *overruled on other grounds*, *Mack Trucks, Inc. v. Tackett*, 841 So. 2d 1107 (Miss. 2003); *Snapp v. Harrison*, 699 So. 2d 567, 570 (Miss. 1997) (quoting *Munford, Inc. v. Peterson*, 368 So. 2d 213, 217 (Miss. 1979) (violation of the Standard Building Code was evidence of negligence per se, though negligence did not establish causation); *Thomas v. McDonald*, 667 So. 2d 594, 596 (Miss. 1995) (violation of statutes governing motor vehicle operation constituted negligence). However, the Mississippi Vulnerable Adults Act addresses only willful acts or omissions that injure vulnerable adults. *See* Miss Code Ann. § 43-47-19 (Rev. 2004). Edwards's estate alleges negligent acts and omissions of the home and its staff were the proximate cause of Edwards's injuries and death. Because the Minimum Standards address only willful violations, they cannot be employed to establish the standard of care applicable in a negligence suit.

24

¶45. The question remains whether Instructions Nine and Ten, taken together with the other instructions, accurately instructed the jury regarding the standard of care applicable in a negligence suit. Though the use of the Minimum Standards might have been error had they been the only basis for establishing the standard of care, in the present case, the instructions given did not deviate significantly from the standard established by the expert testimony of Mariner's expert witness and the director of nursing at Greenwood Health. In light of this expert testimony, Instructions Nine and Ten were sufficiently accurate to withstand scrutiny regarding the standard of care.

¶46. Mariner also objects to Instruction Nineteen, which stated that violation of federal regulations may be considered evidence of negligence, as an impermissibly vague and abstract statement of the law. The cases cited by Mariner are unpersuasive, since they addressed instructions far more inscrutable than the one at issue here. *See **Fred's Stores, Inc. v. M & H Drugs, Inc.**, 725 So. 2d 902, 917-18 (Miss. 1998) (granting of instructions regarding, among other things, the abstract elements of a tort, without any connection to the facts of the case, was error, but ultimately harmless); **Freeze v. Taylor**, 257 So. 2d 509, 511 (Miss. 1972) (finding that the instruction "[t]he Court instructs the jury for the defendant that liability rests not upon danger but upon negligence," was an impermissibly vague and abstract statement of the law). In the alternative, Mariner argues that this instruction creates a cause of action where none was intended. **Warren**, 880 So. 2d at 1037. However, under **Moore**, federal regulations applicable to nursing homes may be used to inform the standard of care. **Moore**, 825 So. 2d at 665. While we find the form of Instruction Nineteen to be flawed, particularly regarding the citations to federal

25

regulations in the body of the instruction, we do not find this to be reversible error. We caution against the use of jury instructions reciting regulations as potentially being vague and abstract as there is no connection relating the facts to the elements of standard of care and causation. The assignment of error is without merit.

**B.** **Whether the Instructions Allowed Consideration of the Separate Conduct of Each Defendant**.

¶47. Mariner claims that the trial court committed reversible error by not instructing the jury to consider the separate defenses and standards of care applicable to the nursing home, the parent company and its subsidiaries, and the officers of those companies. The trial court denied Mariner's proposed instruction D-35, which stated:

> Although there is more than one Defendant in this suit, it does not follow from that fact alone that if one is liable all are liable. Each Defendant is entitled to a fair and separate consideration of that Defendant's defense and is not to be prejudiced by your decision as to the others. Unless otherwise stated, the instructions apply to the case of each Defendant. Decide each Defendant's case separately.

*See also* Miss. Pract. Model Jury Instr. Civil 1:18, Mississippi Judicial College (West 2007). The trial court held that the proposed instruction was misleading and that Mariner could argue its point in closing argument.

¶48. A party is entitled to a jury instruction so long as it concerns a genuine issue of material fact and there is credible evidence to support the instruction. *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818, 824 (Miss. 1992); *see also Copeland v. City of Jackson*, 548 So. 2d 970, 973 (Miss. 1989). However, this Court will not reverse based on the denial of an instruction unless it is shown that the instructions, taken as a whole, do not fairly present the applicable law. *Whitten*, 799 So. 2d at 16.

26

¶49.   We find that the trial court erred in denying Mariner's proposed instruction on separate consideration.  The statement was neither misleading nor an incorrect statement of the law, and the issue of which Defendant was liable for what conduct was the pivotal issue in the case.  The negligence alleged by Edwards's estate was multiple and varied, extending from the actions of the nursing assistants in an individual facility to the institutional polices set at the highest levels of the corporation.  The standard of care applicable to the nursing staff and the director of nursing was not the same as that applicable to corporate officers who set budgetary guidelines for the parent corporation.  Issues of material fact supported by credible evidence justified the instruction.

¶50.   The denial of the proposed instruction, taken together with the ambiguity of several instructions regarding the separate conduct of each Defendant, failed to adequately present the law of the case.  Instructions Nine and Ten, outlining the standards of neglect and abuse, were properly granted as correct statements of the law.  Each instructed the jury that if it found for Edwards's estate as to neglect or abuse, the verdict should only be against those Defendants whose neglect or abuse proximately caused Edwards's injuries.  The trial court did not err in granting these instructions.

¶51.   However, other accepted instructions left the question of separate consideration opaque.  For example, in outlining the elements of Edwards's negligence claim, Instruction Five stated as an element of the tort that "the Defendants should have been reasonably aware of Charles Edwards'[s] condition."  While such an instruction is proper as to Greenwood Health, it is not a proper instruction against other defendants such as National Heritage Realty, which owned the nursing home but presumably had little if

27

anything to do with patients' medical records, or even Mariner Health Care, which as a parent corporation, could not reasonably be expected to be aware of the specific medical needs of one of its patients.

¶52. In cases involving service providers and their parent corporations, the just adjudication of claims demands that parties be held responsible for any breaches of the duties imposed upon them by law. But a plaintiff must carefully establish what duty was owed by whom and how it was not met, and the trial court must insure that the jury is equipped to consider distinct claims and to assess liability judiciously. Because that was not done in this case, the jury's verdict must be reversed.

## VI.    LIABILITY OF ADMINISTRATORS AND LICENSEES

¶53. Mariner maintains that the trial court erred in granting jury instructions Eleven and Twenty, which instructed the jury that the two nursing home licensees and the three nursing home administrators owed a duty of care to the residents of the home. We have recently ruled that nursing home licensees and administrators owe duties to their employers, but that they owe no common-law or statutory duty to the residents of the home. *See **Howard v. Estate of Harper***, 947 So. 2d 854 (Miss. 2006). In light of ***Howard v. Harper***, the licensees and administrators must be dismissed from the suit.

¶54. Mariner argues that the improper joinder of the licensees and administrators requires reversal. However, under Mississippi Code Annotated Section 11-3-37 (Rev. 2002), "one of several appellants shall not be entitled to a judgment of reversal because of an error in the judgment or decree against another, *not affecting his rights in the case*." (Emphasis added). Mississippi has a paucity of cases addressing the impact of the

dismissal of one or more parties on appeal on the interests of the remaining parties. However, the misjoinder of the licensees and administrators did not in any way prejudice Mariner. Though this Court held in *Howard* that licensees and administrators do not owe a duty of care to the residents, they do owe a duty to their employer. As such, the parties could have been called by Edwards's estate to provide relevant testimony. Furthermore, the record demonstrates that all of the licensees and administrators did not testify, and those who did said little that advanced the case against Mariner. While the licensees and administrators must be dismissed from the suit on remand, no tenable basis exists for dismissing the complaint against Mariner. The assignment of error is correct as to the individual administrators and licensees, but is without merit as to Mariner.

## VII. WHETHER IT IS INCUMBENT UPON THIS COURT TO DETERMINE THE SCOPE OF BANKRUPTCY STIPULATION AUTHORIZING EDWARDS'S SUIT.

¶55. After Edwards entered Greenwood Health in December 1994, but before Edwards filed his original complaint on December 7, 2001, and before he died on February 16, 2002, Mariner filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware (January 18, 2000). After discussion, Edwards's counsel and Mariner entered into a stipulation on March 12, 2002, on behalf of Edwards and a number of other plaintiffs under which the plaintiffs could bring legal action, either pre-petition or post-petition, despite the automatic stay imposed on such actions by Section 362 of the Bankruptcy Code. The bankruptcy court ratified the stipulation in a Confirmation Order on April 3, 2002.

29

¶56. The stipulation held that legal action could be brought by "Charles E. Edwards, by and through Nevonnia Turner as Conservatrix of the Use and Benefit of Charles E. Edwards." Edwards amended the complaint on November 4, 2002, to name as the real party "The Estate of Charles E. Edwards, by and through Nevonnia Turner, as adminstratrix of the Estate of Charles E. Edwards, for the use and benefit of the estate of Charles E. Edwards, Deceased, and the wrongful death beneficiaries of Charles E. Edwards, deceased." In its Answer and Defenses to the Amended Complaint, Mariner asserted bankruptcy as a defense, arguing that Edwards's Estate was not named in the stipulation and was therefore barred from bringing suit. Mariner also filed a motion in limine, requesting that the trial court enforce the bankruptcy stipulation. The trial court denied Mariner's motion.

¶57. While the courts of this state have jurisdiction to determine whether a pending action is stayed by a ruling of the bankruptcy court, we recognize that state courts "should consider deferring close questions involving the applicability of exceptions to the automatic stay under 11 U.S.C. § 362(b) to the bankruptcy court." *Overbey v. Murray*, 569 So. 2d 303, 308 (Miss. 1990). In the present case, the bankruptcy stipulation was negotiated in and authorized by the bankruptcy court. Questions regarding the scope of the stipulation and the possibility of recovery under the plan are ultimately matters more properly considered by the bankruptcy court. We therefore decline to interpret the bankruptcy stipulation and leave this determination to the bankruptcy court.

**CONCLUSION**

30

¶58. The trial court erred in declining to investigate Mariner's allegations of juror misconduct, in admitting the depositions of corporate officers into evidence, and in refusing Mariner's proposed jury instruction on separate liability. The trial court's judgment is therefore reversed, and the case remanded (1) with instructions to dismiss with prejudice the licensee and administrator defendents J.D. Lee, George D. Morgan, M. Scott Athans, Angela M. Whittington, Charlie R. Sinclair, Jr., and John M. Merrell, and (2) for a new trial consistent with this opinion of plaintiff's claims against Mariner Health Care, Inc., Grancare, Inc., Evergreen Healthcare, Inc., and National Heritage Realty, Inc.

¶59. **REVERSED AND REMANDED.**

**SMITH, C.J., EASLEY, CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J.**

**APPENDIX**

**Jury Instruction No. 9**

As a resident of Greenwood Health & Rehabilitation Center, the Defendants owed Charles E. Edwards a duty to exercise reasonable care, consistent with his age and physical condition, to prevent the occurrence of and to protect Mr. Edwards from abuse in their nursing home. Abuse as used in these instructions means the willful infliction of physical pain, injury or mental anguish on a vulnerable adult, the unreasonable confinement of a vulnerable adult, or the willful deprivation by a caretaker of services which are necessary to maintain the mental and physical health of a vulnerable adult. Abuse includes, but is not limited to, a single incident.

31

If you find from a preponderance of the credible evidence that Defendants failed to exercise reasonable care to prevent the occurrence of or to protect Mr. Edwards from abuse, as defined in this instruction, and if you further find from a preponderance of the evidence that as a result of such failure, if any, Mr. Edwards suffered abuse while in the Defendants' nursing home, then your verdict should be for the Plaintiff and you should assess damages proximately caused to Mr. Edwards by such abuse, if any.

**Jury Instruction No. 10**

As a resident of Greenwood Health & Rehabilitation Center, the Defendants owed Charles E. Edwards a duty to exercise reasonable care, consistent with his age and physical condition, to prevent neglect of Mr. Edwards in their nursing home. Neglect means the failure of a caretaker to supply a vulnerable adult with the food, clothing, shelter, health care, supervision or other services which are necessary to maintain his mental and physical health. Neglect includes, but is not limited to, a single incident. If you find from a preponderance of the credible evidence that the Defendants, or any of them, failed to supply Mr. Edwards with the food, clothing, shelter, health care, supervision or other services that a reasonably prudent person would have provided in order to maintain Mr. Edwards' mental and physical health, and that as a result thereof, Mr. Edwards suffered injury and damage, then, in that event, your verdict should be for the Plaintiff and you should assess all damages proximately caused to Mr. Edwards by such neglect against the Defendant or Defendants proven by a preponderance of the evidence to be responsible for such neglect, if any.

**Jury Instruction No. 19**

32

At all times material to this case, there were in force in the State of Mississippi regulations providing requirements for long term care facilities, which provided:

a.The facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life. The facility must promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect in full recognition of his or her individuality. 42 C.F.R. § 483.15(a).

b.Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychological well-being, in accordance with the comprehensive assessment and plain of care. 42 C.F.R. § 483.25; Miss. Min. Stds. § 503.2.

c.Assessments must be conducted promptly after a significant change in the resident's physical or mental condition. 42 C.F.R. § 483.20(b)(2)(ii).

> "Significant change" means a major decline or improvement in the resident's status that will not normally resolve itself without further intervention by staff or by implementing standard disease-related clinical interventions, that has an impact on more than one area of the resident's health status, and requires interdisciplinary review or revision of the care plan, or both.

d.Based on the comprehensive assessment of a resident, the facility must ensure that a resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene. 42 C.F.R. § 483.25(a)(3); Miss. Min. Stds. § 503.3.

e.Based on the comprehensive assessment of a resident, the facility must ensure that a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing and that residents without pressure sores do not develop pressure sores unless the resident's clinical condition indicates that they were unavoidable. 42 C.F.R. § 483.25(e)(2); Miss. Min. Stds. § 503.3.

f.Based on a resident's comprehensive assessment, the facility must ensure that a resident maintains acceptable parameters of nutritional status, such as body weight, and protein levels, unless the resident's clinical condition demonstrates that this is not possible. 42 C.F.R. § 483.25(i)(1); Miss. Min. Stds. § 503.9.

g.The facility must provide each resident with sufficient fluid intake to maintain proper hydration and health. 42 C.F.R. § 483.25(j); Miss. Min. Stds. § 503.10.

h.The facility must ensure that a resident with a limited range of motion receives appropriate treatment and services to increase range of motion and/or to prevent further decrease in range of motion. 42 C.F.R. § 483.25(e); Miss. Min. Stds. § 503.5.

i.The facility must ensure that a resident who is fed by a feeding tube receives the appropriate treatment and services to prevent aspiration pneumonia, diarrhea, vomiting dehydration, and metabolic abnormalities and to restore, if possible, normal eating skills. 42 C.F.R. § 483.25(g)(2); Miss. Min. Stds. § 503.7.

j.Based on a resident's comprehensive assessment, the facility must ensure that a resident with special needs, including the need for parenteral or enteral nutrition fluids, receives proper treatment and care. 42 C.F.R. § 483.25(k); Miss. Min. Stds. § 503.11.

k. The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident, as determined by resident assessments and individual plans or care. 42 C.F.R. § 483.30; Miss. Min. Stds. § 201.1.

l. The facility must maintain clinical records on each resident in accordance with accepted professional standards and practices that are complete and accurately documented. 42 C.F.R. § 483.75(l)(1)(i)(ii); Miss. Min. Stds. § 507.1.

m. The facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident. 42 C.F.R. § 483.75; Miss. Min. Stds. § 403.1.

A violation of one or more of these regulations, although not necessarily negligence, may be considered by you as evidence of negligence along with all of the other facts and circumstances in the case.

**GRAVES, JUSTICE, DISSENTING:**

¶60.    Because I would affirm the trial court on all counts, I respectfully dissent.

¶61.    The majority is correct that Juror "B" did allege in her affidavit that Juror "W" had made up her mind on the first day of trial, that she knew a resident at Greenwood Health who received poor care and that she knew of others who had received poor care. The majority also correctly states that the affidavit did not specify whether the statements regarding poor care were made during deliberations. The majority finds that the affidavit

35

implicitly includes Juror "W" among those who made certain comments. However, the affidavit clearly does not support such a finding. The affidavit states:

> In addition, juror comments during the trial and deliberations included statements that the white people have been taking the black people's money and black people have figured out that lawsuits are the way to get the money back. It was also stated that white people were now trying to put a cap on lawsuit awards. It was argued that the jurors needed to stick together to get the money back to the black people and that money should be given in this case because the plaintiff was black.

¶62. This paragraph fails to allege or even suggest that Juror "W" made any of these statements. The very next paragraph of the affidavit further establishes that this allegation does not pertain to Juror "W" and instead can be attributed to "others."

¶63. Rule 606(b) of the Mississippi Rules of Evidence (M.R.E.), states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

M.R.E. 606(b).

¶64. Pursuant to M.R.E. 606(b), the trial court properly found that the juror's affidavit was not competent evidence because "it attempts to impeach a verdict by testifying about influences affecting deliberations and no adequate showing has been made of external influences nor extra-record facts as defined previously."

¶65. The majority concedes that the affidavit contained information regarding the mental impressions of both Juror "B" and Juror "W, " but then finds that Juror "W" failed to respond to questions during voir dire. However, I disagree. The majority is improperly relying solely on allegations contained in the affidavit, which is not competent evidence, as support for the finding that Juror "W" failed to respond to questions.

¶66. The majority is correct that the standard for review for juror misconduct in failing to respond to questions during voir dire is set out in *Odom v. State,* 355 So. 2d 1381 (Miss. 1978). *Odom* states:

> Therefore, we hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited."

*Id.* at 1383.

¶67. The majority finds that Juror "W" failed to respond to the following question by plaintiff's counsel:

> Q. Each of you understand that we are not here for sympathy, that we are here for justice, each of you understand that? Do each of you here think you could recognize appeal to prejudice?
> And as you sit here today, is there anybody who has any reason to feel that there is any reason that we haven't touched on, that you feel that we ought to know that would adversely impact your ability to serve as a juror in this case, that we haven't discussed thus far?

¶68. This question is "in the nature of 'catch-all' questions, designed to elicit any information from jurors that would cause them not to be impartial." *Tolbert v. State*, 511

37

So. 2d 1368, 1377-78 (Miss. 1987). This Court has found general, catch-all questions to be necessarily ambiguous. *Id.* *See also* ***Buckley v. State***, 772, So. 2d 1059, 1064 (Miss. 2000). This question fails the second prong of ***Odom***, as cited herein.

¶69.    Additionally, there is no evidence that Juror "W" had "substantial knowledge of the information sought to be elicited" under prong three when the question is unclear as to what information is even being sought. *Id.* This Court has acknowledged the difficulty in proving prong three, noting in ***Odom***, that, "[w]e do not suggest how this may be proved as that question was not raised or briefed. However, the general rule is that a juror may not testify to impeach a verdict rendered by them." *Id*. at n. 1. Further, even if Juror "W" had "substantial knowledge of the information which through proper questions the attorneys were entitled to know," Mariner would have to establish that Juror "W" would have been subject to a defense challenge for cause. ***Tolbert*** 511 So. 2d at 1378. Mariner is unable to do that. No question was asked during voir dire that went to the specific claims now raised in the affidavit. Moreover, even if a specific question had been asked, there is no way to predict how Juror "W" might have answered that question or any follow-up questions.

¶70.    The majority also finds that Juror "W" failed to respond to a question as to whether "just the mention of a nursing home invoke [sic] negative feelings, negative experience?" Again, this question is ambiguous. Further, there is absolutely no evidence contained in the affidavit or anywhere else in the record establishing that the mere "mention of a nursing home" caused Juror "W" to have negative feelings. Therefore, the majority's finding as to this issue likewise fails both prongs two and three of ***Odom***.

38

¶71.   There is absolutely no evidence before this Court to suggest that Juror "W" "withheld material information during voir dire which would have resulted in her being challenged" and "then relayed that exact disqualifying information to the other members of the jury during deliberations" pursuant to *T.K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 950 (Miss. 1992).

¶72.   Moreover, the *Odom* test has since been expanded to include a fourth prong requiring that "prejudice . . . in selecting the jury could reasonably be inferred from the juror's failure to respond." *Payton v. State*, 897 So. 2d 921, 954 (Miss. 2003) (citing *Chase v. State*, 645 So. 2d 829, 847 (Miss. 1994); *Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990); and *Odom*).   Assuming that the first three elements had been met, Mariner has not shown that it was prejudiced by the juror's failure to respond.  *See **Buckley,*** 772 So. 2d at 1065 ("Whether prejudice can be inferred in the jury selection process due to [juror's] silence is an inquiry this Court makes only after the *Odom* factors have been answered in the affirmative.")  Additionally, Mariner would not be able to show prejudice with regard to Juror "W" because the verdict was 10-2 for compensatory damages.[5]

¶73.   In *Payton*, this Court found:

> This alleged information came from the jurors' own knowledge of the facts and witnesses.  It in no way relates to extraneous information supplied from outside the jury room.  The only allegations before the trial court were that the jurors themselves discussed matters outside the evidence at trial.  There was no evidence that someone outside the twelve jurors did something to influence their deliberations.

---

[5]Only nine or more jurors are necessary for a civil verdict.  Miss. Code Ann. §13-5-93 (Rev. 2002).

***Id.*** at 954.

¶74. In the case sub judice, the allegations pertain to the juror's own knowledge and not to any extraneous information from someone outside the twelve jurors. This Court has also held that "[i]n the absence of a threshold showing of external influences, an inquiry into the jury verdict is not required." ***Id.*** (citing ***Gladney v. Clarksdale Beverage Co.***, 625 So. 2d 407, 419 (Miss. 1993)). Clearly, an inquiry into the jury verdict is not required. For these reasons, I would find that the trial court properly denied the motion to contact jurors.

¶75. With regard to the third issue, the majority finds that the deposition testimony of two corporate officers was not probative to the issues of duty, breach, causation or injury. The majority further finds that the admission of this testimony prejudiced Mariner and constituted reversible error. I disagree.

¶76. Boyd Gentry, senior vice president and treasurer of Mariner, testified, not only about cost and cash, but also about care and census.[6] Gentry said:

> The four Cs are really meant to be a way of thinking about our business as a whole. So while my direct activities may be tied to cash or cost, in us thinking about our business, the senior management team is extremely focused on care and census.
> And we really – I guess we don't often have conversations about the one without having conversations about the other. It's always kind of the four Cs.

¶77. Roy Dumas, regional vice president of operations for the south district of Mariner, testified that he was the direct supervisor of the administrators of various facilities under

---

[6]Gentry defined census as: "Our patients and our residents." Gentry further said that "it relates to them as people, and they are our business."

40

the Mariner umbrella. Dumas further offered testimony as to the four Cs and as to the various monthly reports he received. These reports included, but were not limited to, reports detailing the number of falls, injuries, whether staff was following medical protocol, how many residents had lost weight, and the total number of pressure sores.

¶78. The majority states, "Plaintiff's counsel relied on this testimony and the testimony of Mariner's senior vice president and treasurer to portray Mariner as a company focused on financial success rather than competent care." The majority is apparently referring to comments made during the opening statement and closing argument, which are not evidence.

¶79. The majority finds that "the testimony was not probative to the issues of duty, breach, causation, or injury." The majority's finding means that testimony from the vice president of operations about the care and treatment of patients would be deemed irrelevant in a trial about the care and treatment of a patient. The majority's finding is clearly erroneous. Therefore, I would find that the evidence was properly introduced.

¶80. In issue V(B), the majority finds that the trial court committed reversible error in not instructing the jury to consider the separate conduct of each defendant. I disagree. Mariner takes issue with the denial of a single instruction. However, the other instructions, taken as a whole, fairly present the applicable law. *See **Whitten v. Cox***, 799 So. 2d 1, 16 (Miss. 2000). Therefore, I would find that this issue is without merit.

¶81. Accordingly, for the reasons stated herein, I respectfully dissent.

**DIAZ, P.J., JOINS THIS OPINION.**

41